# In the United States Court of Federal Claims

**No. 21-2323C**
**Filed: August 31, 2022**
**Reissued for Publication: September 18, 2022[1]**

```
* * * * * * * * * * * * * * * * *   *
                                    *
GOODWILL INDUSTRIES OF SOUTH        *
FLORIDA, INC.,                      *
                                    *
              Protestor,            *
                                    *
v.                                  *
                                    *
UNITED STATES,                      *
                                    *
              Defendant.            *
                                    *
* * * * * * * * * * * * * * * * *   *
```

**Alan M. Grayson,** Windermere, FL, for protestor.

**Ann C. Moto**, Trial Attorney, Department of Justice, Commercial Litigation Branch, Civil Division, Washington, DC, for defendant. With her were **Steven J. Gillingham,** Assistant Director, Commercial Litigation Branch, **Patricia M. McCarthy**, Director, Commercial Litigation Branch, and **Brian M. Boynton**, Principal Deputy Assistant Attorney General. **Allison Colsey Eck,** Defense Logistics Agency, Troop Support, of counsel.

## O P I N I O N

### HORN, J.

In the bid protest filed in this court, protestor Goodwill Industries of South Florida, Inc., sought to

> enjoin the award or continued performance of any federal contract or contracts, or the modification of any federal contract or contracts, awarded to or performed by entities other than Goodwill [Industries of South Florida], for the production (in whole or in part) of military equipment items known as Women's Army Improved Hot Weather Combat Uniform trousers ("Women's IHWCU Trousers" or the "Goodwill items").

---

[1] This Opinion was issued under seal on August 31, 2022. The parties were asked to propose redactions prior to public release of the Opinion. This Opinion is issued without redactions since the parties proposed no redactions in response to the court's request.

(alteration added).[2]

The Javits-Wagner-O'Day (JWOD) Act, titled "Committee for Purchase From People Who Are Blind or Severely Disabled," 41 U.S.C. §§ 8501–06 (2018), and its implementing regulations create a government procurement set aside for qualified nonprofits. It is uncontested that protestor, Goodwill Industries of South Florida, is a JWOD Act qualified nonprofit. Goodwill Industries of South Florida contends that it is a "mandatory source of supply for" the Women's IHWCU Trousers and that the government's "procurement of the Goodwill items from any source other than Goodwill [Industries of South Florida] is a violation of procurement statutes and regulations." (alteration added). Therefore, according to protestor, "[b]ecause Goodwill [Industries of South Florida] is the mandatory source of supply for the Goodwill items, if DLA [Defense Logistics Agency] can issue solicitations for the Goodwill items at all, DLA should require awardees under the Solicitations to acquire the Goodwill items from Goodwill [Industries of South Florida]." (alterations added). Goodwill Industries of South Florida's bid protest complaint challenges solicitation No. SPE1C1-21-R-0029, which was divided into two parts, an awarded small business set aside contract, and a future award to a HUBZone contractor. According to the defendant, the United States, through the procuring agency, the "DLA is a 'defense agency' under the authority, direction, and control of the Department of Defense." See 10 U.S.C. §§ 191–92 (2018); Department of Defense Directive (DoDD) 5105.22 (June 29, 2017). This Opinion memorializes the oral decision previously issued by the court in response to represented, urgent impending procurement deadlines. The decision granted protestor Goodwill Industries of South Florida's motion for judgment on the Administrative Record, including injunctive relief, which was effective immediately at the time of the oral decision.

### FINDINGS OF FACT

When enacted, the JWOD Act was titled "Committee for Purchase from People Who Are Blind or Severely Disabled." 41 U.S.C. §§ 8501–06. Subsequently, the "Committee for Purchase From People Who Are Blind or Severely Disabled," was renamed in a November 27, 2006 notice filed in the Federal Register:

The Committee for Purchase From People Who Are Blind or Severely Disabled (the Committee) has deliberated and voted to change the name of the JWOD Program to the AbilityOne Program. The name of the program is being changed to AbilityOne to give a stronger, more unified identity to the

---

[2] The court uses the term "Women's IHWCU Trousers" to refer to the Improved Hot Weather Combat Uniform Trousers designed specifically for women, the items at issue in this protest. These items are sometimes referred to by the parties as "IHWCU-F" Trousers, "Hot Weather Trousers," or the "Goodwill items."

program and to show a connection between the program name and the
abilities of those who are blind or have other severe disabilities.

AbilityOne Program, 71 Fed. Reg. 68492-01 (Nov. 27, 2006).[3]

The JWOD Act directs AbilityOne to create and maintain a Procurement List. The
JWOD Act provides:

(a)  Procurement List.–

(1) Maintenance of list.—The Committee shall maintain and publish in
the Federal Register a procurement list. The list shall include the
following products and services determined by the Committee to be
suitable for the Federal Government to procure pursuant to this
chapter:
(A) Products produced by a qualified nonprofit agency for the blind
or by a qualified nonprofit agency for other severely disabled.
(B) The services those agencies provide.

(2) Changes to list.—The Committee may, by rule made in accordance
with the requirements of section 553(b) to (e) of title 5, add to and
remove from the procurement list products so produced and services
so provided.

41 U.S.C. § 8503(a) (2018). The JWOD Act also provides:

(c) Central nonprofit agency or agencies.—The Committee shall designate
a central nonprofit agency or agencies to facilitate the distribution, by direct
allocation, subcontract, or any other means, of orders of the Federal
Government[4] for products and services on the procurement list among

---

[3] The court uses the newer AbilityOne title, but leaves unchanged any quotations as they
exist in relevant documents, including briefs and attachments filed with the court, which
sometimes refer to AbilityOne as the "Commission."

[4] The JWOD Act states:

The terms "entity of the Federal Government" and "Federal Government"
include an entity of the legislative or judicial branch, a military department
or executive agency (as defined in sections 102 and 105 of title 5,
respectively), the United States Postal Service, and a nonappropriated fund
instrumentality under the jurisdiction of the Armed Forces.

41 U.S.C. § 8501(a) (2018).

qualified nonprofit agencies for the blind or qualified nonprofit agencies for other severely disabled.
(d) Regulations.—The Committee—
    (1)  may prescribe regulations regarding specifications for products and services on the procurement list, the time of their delivery, and other matters as necessary to carry out this chapter; and
    (2)  shall prescribe regulations providing that when the Federal Government purchases products produced and offered for sale by qualified nonprofit agencies for the blind or qualified nonprofit agencies for other severely disabled, priority shall be given to products produced and offered for sale by qualified nonprofit agencies for the blind.

41 U.S.C. § 8503(c)–(d). With regard to specific procurement requirements, the JWOD Act provides:

    (a)  In general.—An entity of the Federal Government intending to procure a product or service on the procurement list referred to in section 8503 of this title shall procure the product or service from a qualified nonprofit agency for the blind or a qualified nonprofit agency for other severely disabled in accordance with regulations of the Committee and at the price the Committee establishes if the product or service is available within the period required by the entity.
    (b)  Exception.—This section does not apply to the procurement of a product that is available from an industry established under Chapter 307 of title 18 and that is required under section 4124 of title 18 to be procured from that industry.

41 U.S.C. § 8504(a)–(b) (2018).

In SEKRI, Inc. v. United States, 34 F.4th 1063 (Fed. Cir. 2022), the United States Court of Appeals for the Federal Circuit offered a helpful and concise summary of the JWOD Act's legislative history and purpose:

The Javits-Wagner-O'Day Act ("JWOD Act") was originally enacted in 1938 to prioritize purchasing of products from suppliers that employed blind individuals. U.S. Statutes at Large, 75 Cong. Ch. 697, 52 Stat. 1196 (June 25, 1938) (JWOD Act). The JWOD Act established the "Committee on Purchases of Blind-made Products" and charged it with various duties, including determining fair market prices of "brooms and mops and other suitable commodities manufactured by the blind and offered for sale to the [f]ederal [g]overnment by any non-profit-making agency for the blind." Id. § 2. The Act stated, "All brooms and mops and other suitable commodities hereafter procured in accordance with applicable [f]ederal specifications by

or for any [f]ederal department or agency *shall be procured* from such non-profit-making agencies for the blind in all cases where such articles are available within the period specified at the price determined by the committee . . . ." Id. § 3.

The legislative history of the 1938 JWOD Act shows that Congress intended to create a procurement system in which the government would be required to purchase certain products from suppliers that employ blind individuals. Under the new system, the government would "distribute . . . orders among . . . agencies for the blind. In other words, instead of the present cutthroat competition[,] the blind people who are engaged in this type of work will be able to obtain it at a fair price." 83 Cong. Rec. 9111 (1938). The bill would take the buying of mops, brooms, and other suitable commodities "*out of competitive bidding.*" Id. (emphasis added); see also S. Rep. 75-1330, at 2 (1938). Congress expanded the JWOD Act in 1971 to similarly protect suppliers that employ "other severely handicapped" individuals. Pub. L. No. 92-28, 85 Stat. 77, 80 (1971); see also S. Rep. No. 92-41, at 1 (1971) (stating Congress's principal objectives). Congress again amended the law in 2011 by, among other things, renaming the Committee to be called the "Committee for Purchase From People Who Are Blind or Severely Disabled." Pub. L. No. 111-350, 124 Stat. 3677, 3826 (2011).

The JWOD Act today, 41 U.S.C. §§ 8501–06, establishes a procurement system, overseen by the Committee, in which the government procures certain commodities and services from nonprofit agencies that employ the blind or otherwise severely disabled. The Committee has the responsibilities of, among other things, (i) maintaining and publishing a "procurement list" identifying products and services made or rendered by qualified nonprofit agencies for the blind or severely disabled, (ii) designating one or more "central nonprofit agencies" to facilitate the distribution of orders for the products and services on the procurement list, and (iii) prescribing regulations implementing the law. See 41 U.S.C. § 8503.

SEKRI, Inc. v. United States, 34 F.4th at 1065–66 (emphasis and alterations in original). The Federal Circuit further explained:

The Committee has promulgated regulations that define the complex "AbilityOne Program," which is the Committee's name for the JWOD Act procurement system. 41 C.F.R. pt. 51. These regulations reiterate the mandatory nature of the AbilityOne Program. See 41 C.F.R. § 51–1.2(a) (stating that the JWOD Act "mandates that commodities or services on the [p]rocurement [l]ist required by [g]overnment entities be procured" from a qualified nonprofit agency).

The Committee's regulations describe the role of the "central nonprofit agencies" in the AbilityOne Program. The regulations designate SourceAmerica (formerly known as NISH) as the central nonprofit agency that works, in a number of respects, with nonprofit agencies that employ people with severe disabilities other than blindness. Id. §§ 51–3.1 to –3.2. SourceAmerica is responsible for representing those nonprofit agencies when dealing with the Committee; evaluating the qualifications and capabilities of nonprofit agencies; recommending commodities and services for inclusion on the procurement list; distributing orders from government contracting activities; and recommending price changes. Id. § 51–3.2. The regulations also impose requirements on participating nonprofit agencies to, for example, initially qualify for participation in the AbilityOne Program and thereafter maintain their qualification. See id. pt. 51–4.

SEKRI, Inc. v. United States, 34 F.4th at 1066–67 (all alterations in original; footnote omitted); see also PDS Consultants, Inc. v. United States, 907 F.3d 1345, 1348 (Fed. Cir. 2018) ("The JWOD Act was enacted in 1938 to provide employment opportunities for the blind, and was amended in 1971 to provide such opportunities for 'other severely disabled individuals.'"), cert. denied sub. nom. Winston-Salem Indus. for the Blind v. PDS Consultants, Inc., 140 S. Ct. 909 (2020).

The implementing regulations for the JWOD Act are contained in Titles 41 and 48 of the Code of Federal Regulations. Regarding the policy of the JWOD Act, the implementing regulations state:

(a)  It is the policy of the Government to increase employment and training opportunities for persons who are blind or have other severe disabilities through the purchase of commodities and services from qualified nonprofit agencies employing persons who are blind or have other severe disabilities. The Committee for Purchase from People who are Blind or Severely Disabled (hereinafter the Committee) was established by the Javits-Wagner-O'Day Act, Public Law 92-28, 85 Stat. 77 (1971), as amended, 41 U.S.C. 46-48c (hereinafter the JWOD Act). The Committee is responsible for implementation of a comprehensive program designed to enforce this policy.

(b)  It is the policy of the Committee to encourage all Federal entities and employees to provide the necessary support to ensure that the JWOD Act is implemented in an effective manner. This support includes purchase of products and services published on the Committee's Procurement List through appropriate channels from nonprofit agencies employing persons who are blind or have other severe disabilities designated by the Committee; recommendations to the Committee of new commodities and services suitable for addition to the Procurement List; and cooperation with the Committee and the central nonprofit

agencies in the provision of such data as the Committee may decide is necessary to determine suitability for addition to the Procurement List.

41 C.F.R. § 51-1.1 (2020).

To further the policy of the JWOD Act, the implementing regulations establish "Mandatory source priorities." 41 C.F.R. § 51-1.2(a) (2020). The regulation at 41 C.F.R. § 51-1.2(a) provides:

(a) The JWOD Act mandates that commodities or services on the Procurement List required by Government entities be procured, as prescribed in this regulation, from a nonprofit agency employing persons who are blind or have other severe disabilities, at a price established by the Committee, if that commodity or service is available within the normal period required by that Government entity. Except as provided in paragraph (b) of this section, the JWOD Act has priority, under the provisions of 41 U.S.C. § 48,[5] over any other supplier of the Government's requirements for commodities and services on the Committee's Procurement List.

41 C.F.R. § 51-1.2(a) (alteration added). The JWOD Act implementing regulations define the Procurement List as "a list of commodities (including military resale commodities) and services which the Committee has determined to be suitable to be furnished to the Government by nonprofit agencies for the blind or nonprofit agencies employing persons with severe disabilities pursuant to the JWOD Act and these regulations." 41 C.F.R. § 51-1.3 (2020).

The implementing regulation at 41 C.F.R. § 51-2.2 explains that:

[t]he Committee is responsible for carrying out the following functions in support of its mission of providing employment and training opportunities for persons who are blind or have other severe disabilities and, whenever possible, preparing those individuals to engage in competitive employment:

(a) Establish rules, regulations, and policies to assure effective implementation of the JWOD Act.
(b) Determine which commodities and services procured by the Federal Government are suitable to be furnished by qualified nonprofit agencies employing persons who are blind or have other severe disabilities and add those items to the Committee's Procurement List. Publish notices of addition to the Procurement List in the Federal Register. Disseminate information on Procurement List items to Federal agencies. Delete items no

---

[5] The mandatory source requirement was formerly codified at 41 U.S.C. § 48 and was recodified at 41 U.S.C. § 8504.

longer suitable to be furnished by nonprofit agencies. Authorize and deauthorize central nonprofit agencies and nonprofit agencies to accept orders from contracting activities for the furnishing of specific commodities and services on the Procurement List.

(c) Determine fair market prices for items added to the Procurement List and revise those prices in accordance with changing market conditions to assure that the prices established are reflective of the market.

(d) Monitor nonprofit agency compliance with Committee regulations and procedures.

(e) Inform Federal agencies about the AbilityOne Program and the statutory mandate that items on the Procurement List be purchased from qualified nonprofit agencies, and encourage and assist entities of the Federal Government to identify additional commodities and services that can be purchased from qualified nonprofit agencies. To the extent possible, monitor Federal agencies' compliance with JWOD requirements.

(f) Designate, set appropriate ceilings on fees paid to these central nonprofit agencies by nonprofit agencies selling items under the AbilityOne Program, and provide guidance to central nonprofit agencies engaged in facilitating the distribution of Government orders and helping State and private nonprofit agencies participate in the AbilityOne Program.

(g) Conduct a continuing study and evaluation of its activities under the JWOD Act for the purpose of assuring effective and efficient administration of the JWOD Act. The Committee may study, independently, or in cooperation with other public or nonprofit private agencies, problems relating to:

> (1) The employment of the blind or individuals with other severe disabilities.
>
> (2) The development and adaptation of production methods which would enable a greater utilization of these individuals.

(h) Provide technical assistance to the central nonprofit agencies and the nonprofit agencies to contribute to the successful implementation of the JWOD Act.

(i) Assure that nonprofit agencies employing persons who are blind will have priority over nonprofit agencies employing persons with severe disabilities in furnishing commodities.

41 C.F.R. § 51-2.2 (2020). The JWOD Act implementing regulations also state there is a "statutory mandate that items on the Procurement List be purchased from qualified nonprofit agencies." 41 C.F.R. § 51-2.2; see also 41 U.S.C. § 8504(a).

Before adding or deleting an item from the Procurement List, the JWOD Act implementing regulations state:

> At least 30 days prior to the Committee's consideration of the addition or deletion of a commodity or service to or from the Procurement List, the

Committee publishes a notice in the Federal Register announcing the proposed addition or deletion and providing interested persons an opportunity to submit written data or comments on the proposal.

41 C.F.R. § 51-2.3 (2020). In addition, before adding or deleting items, there must be a "Determination of Suitability," which requires:

(a) For a commodity or service to be suitable for addition to the Procurement List, each of the following criteria must be satisfied:

    (1) *Employment Potential*. The proposed addition must demonstrate a potential to generate employment for persons who are blind or have other severe disabilities.

    (2) *Nonprofit agency qualifications*. The nonprofit agency (or agencies) proposing to furnish the item must qualify as a nonprofit agency serving persons who are blind or have other severe disabilities, as set forth in part 51-4 of this chapter.

    (3) *Capability*. The nonprofit agency (or agencies) desiring to furnish a commodity or service under the JWOD Program must satisfy the Committee as to the extent of the labor operations to be performed and that it will have the capability to meet Government quality standards and delivery schedules by the time it assumes responsibility for supplying the Government.

    (4) Level of impact on the current contractor for the commodity or service.

        (i) In deciding whether or not a proposed addition to the Procurement List is likely to have a severe adverse impact on the current contractor for the specific commodity or service, the Committee gives particular attention to:

            (A) The possible impact on the contractor's total sales, including the sales of affiliated companies and parent corporations. In addition, the Committee considers the effects of previous Committee actions.

            (B) Whether that contractor has been a continuous supplier to the Government of the specific commodity or service proposed for addition and is, more dependent on the income from such sales to the Government.

        (ii) If there is not a current contract for the commodity or service being proposed for addition to the Procurement List, the Committee may consider the most recent contractor to furnish the item to the Government as the current contractor for the purpose of determining the level of impact.

41 C.F.R. § 51-2.4(a) (2020) (emphasis in original). When determining whether an item should be added to the Procurement List,

[t]he Committee considers the particular facts and circumstances in each case in determining if a commodity or service is suitable for addition to the Procurement List. When the Committee determines that a proposed addition is likely to have a severe adverse impact on a current contractor, it takes this fact into consideration in deciding not to add the commodity or service to the Procurement List, or to add only a portion of the Government requirement for the item. If the Committee decides to add a commodity or service in whole or in part to the Procurement List, that decision is announced in the Federal Register with a notice that includes information on the effective date of the addition.

41 C.F.R. § 51-2.5 (2020).

The JWOD Act implementing regulation at 41 C.F.R. § 51-2.8 explains:

(a) The Committee maintains a Procurement List which includes the commodities and services which shall be procured by Government departments and agencies under the JWOD Act from the nonprofit agency(ies) designated by the Committee. Copies of the Procurement List, together with information on procurement requirements and procedures are available to contracting activities upon request.

(b) For commodities, including military resale commodities, the Procurement List identifies the name and national stock number or item designation for each commodity, and where appropriate, any limitation on the portion of the commodity which must be procured under the JWOD Act.

41 C.F.R. § 51-2.8(a)–(b) (2020).

Notably, the JWOD Act implementing regulations impose specific duties on federal contracting activities to promote the goals of the JWOD Act. For example, 41 C.F.R. § 51-5.1 provides:

(a) Contracting activities are encouraged to assist the Committee and the central nonprofit agencies in identifying suitable commodities and services to be furnished by nonprofit agencies employing persons who are blind or have other severe disabilities so that the Committee can attain its objective of increasing employment and training opportunities for individuals who are blind or have other severe disabilities. For items which appear to be suitable to be furnished by nonprofit agencies, the contracting activity should refer the candidate commodities and services to the Committee or a central nonprofit agency. If a contracting activity decides to procure one or more commodities which are similar to a commodity or commodities on the Procurement List, the contracting activity should refer the commodities it intends to procure to the Committee or a central nonprofit agency.

(b) Contracting activities shall provide the Committee and designated central nonprofit agencies with information needed to enable the Committee to determine whether a commodity or service is suitable to be furnished by a nonprofit agency. For commodities, information such as the latest solicitation and amendments, bid abstracts, procurement history, estimated annual usage quantities, and anticipated date or next solicitation issuance and opening may be needed. For services, similar information including the statement of work and applicable wage determination may be required. In order to assist in evaluating the suitability of an office of Management and Budget Circular A-76 conversion, contracting activities should provide a copy of the draft statement of work and applicable wage determination to the central nonprofit agency upon its request.

41 C.F.R. § 51-5.1 (2020).

For federal entities that seek to procure items on the Procurement List, the regulation at 41 C.F.R. § 51-5.2 establishes JWOD qualified nonprofit organizations as the mandatory sources of supply for Procurement List items. The regulation at 41 C.F.R. § 51-5.2, titled "Mandatory source requirement," provides:

(a) Nonprofit agencies designated by the Committee are mandatory sources of supply for all entities of the Government for commodities and services included on the Procurement List, as provided in § 51-1.2 of this chapter.
(b) Purchases of commodities on the Procurement List by entities of the Government shall be made from sources authorized by the Committee. These sources may include nonprofit agencies, central nonprofit agencies, Government central supply agencies such as the Defense Logistics Agency and the General Services Administration, and certain commercial distributors. Identification of the authorized sources for a particular commodity may be obtained from the central nonprofit agencies at the addresses noted in § 51-6.2 of this chapter.
(c) Contracting activities shall require other persons providing commodities which are on the Procurement List to entities of the Government by contract to order these commodities from the sources authorized by the Committee.

41 C.F.R. § 51-5.2(a)–(c) (2020). With regard to the scope of the mandatory source requirement, the JWOD Act implementing regulation at 41 C.F.R. § 51-5.3(a) states:

(a) When a commodity is included on the Procurement List, the mandatory source requirement covers the National Stock Number or item designation listed and commodities that are essentially the same as the listed item. In some instances, only a portion of the Government requirement for a National Stock Number or item designation is specified by the Procurement List. Where geographic areas, quantities, percentages or specific supply locations for a commodity are listed, the mandatory provisions of the JWOD

11

Act apply only to the portion or portions of the commodity indicated by the Procurement List.

41 C.F.R. § 51-5.3(a) (2020).

In specific circumstances, it may be appropriate for AbilityOne or a central nonprofit agency to grant a purchase exception to the mandatory source requirement enumerated by the JWOD Act and its implementing regulations. The implementing regulation at 41 C.F.R. § 51-5.4 explains:

(a)  A central nonprofit agency will normally grant a purchase exception for a contracting activity to procure from commercial sources commodities or services on the Procurement List when both of the following conditions are met:
   (1)  The central nonprofit agency or its nonprofit agency(ies) cannot furnish a commodity or service within the period specified, and
   (2)  The commodity or service is available from commercial sources in the quantities needed and significantly sooner than it will be available from the nonprofit agency(ies).
(b)  The central nonprofit agency may grant a purchase exception when the quantity involved is not sufficient to be furnished economically by the nonprofit agency(ies).
(c)  The Committee may also grant a purchase exception for the reasons set forth in paragraphs (a) and (b) of this section.
(d)  The central nonprofit agency shall obtain the approval of the Committee before granting a purchase exception when the value of the procurement exceeds the simplified acquisition threshold set forth in the Federal Acquisition Streamlining Act of 1994 or any subsequent amendments thereto.
(e)  When the central nonprofit agency grants a purchase exception under the above conditions, it shall do so promptly and shall specify the quantities and delivery period covered by the exception.
(f)  When a purchase exception is granted under paragraph (a) of this section:
   (1)  Contracting activities shall initiate purchase actions within 15 days following the date of the purchase exception. The deadline may be extended by the central nonprofit agency with, in cases of procurements exceeding the simplified acquisition threshold, the concurrence of the Committee.
   (2)  Contracting activities shall furnish a copy to the solicitation to the appropriate central nonprofit agency at the time it is issued, and a copy of the annotated bid abstract upon awarding of the commercial contract.
(g)  Any decision by a central nonprofit agency regarding a purchase exception may be appealed to the Committee by the contracting activity.

41 C.F.R. § 51-5.4 (2020).

If the appropriate central nonprofit agency or AbilityOne determines that a particular order for Procurement List items may exceed the capability of one or more nonprofits, the JWOD Act implementing regulations authorize either the central nonprofit or AbilityOne to issue a purchase exception to the mandatory source requirement. The regulation at 41 C.F.R. § 51-6.7 provides:

(a) Nonprofit agencies are expected to furnish commodities on the Procurement List within the time frames specified by the Government. The nonprofit agency must have the necessary production facilities to meet normal fluctuations in demand.

(b) Nonprofit agencies shall take those actions necessary to ensure that they can ship commodities within the time frames specified by the Government. In instances where the nonprofit agency determines that it cannot ship the commodity in the quantities specified by the required shipping date, it shall notify the central nonprofit agency and the contracting activity. The central nonprofit agency shall request a revision of the shipping schedule which the contracting activity should grant, if feasible, or the central nonprofit agency shall issue a purchase exception authorizing procurement from commercial sources as provided in § 51-5.4 of this chapter.

41 C.F.R. § 51-6.7 (2020).

To delete items from the Procurement List, the JWOD Act implementing regulation at 41 C.F.R. § 51-6.8 states:

(a) When a central nonprofit agency decides to request that the Committee delete a commodity or service from the Procurement List, it shall notify the Committee staff immediately. Before reaching a decision to request a deletion of an item from the Procurement List, the central nonprofit agency shall determine that none of its nonprofit agencies is capable and desirous of furnishing the commodity or service involved.

(b) Except in cases where the Government is no longer procuring the item in question, the Committee shall, prior to deleting an item from the Procurement List, determine that none of the nonprofit agencies of the other central nonprofit agency is desirous and capable of furnishing the commodity or service involved.

(c) Nonprofit agencies will normally be required to complete production of any orders for commodities on hand regardless of the decision to delete the item. Nonprofit agencies shall obtain concurrence of the contracting activity and the Committee prior to returning a purchase order to the contracting activity.

(d) For services, a nonprofit agency shall notify the contracting activity of its intent to discontinue performance of the service 90 days in advance of the

13

termination date to enable the contracting activity to assure continuity of the service after the nonprofit agency's discontinuance.

(e)  The Committee may delete an item from the Procurement List without a request from a central nonprofit agency if the Committee determines that none of the nonprofit agencies participating in the AbilityOne Program are capable and desirous of furnishing the commodity or service to the Government, or if the Committee decides that the commodity or service is no longer suitable for procurement from nonprofit agencies employing people who are blind or have other severe disabilities.  In considering such an action, the Committee will consult with the appropriate central nonprofit agency, the nonprofit agency or agencies involved, and the contracting activity.

41 C.F.R. § 51-6.8 (2020).

With regard to replacement and similar commodities, the JWOD Act implementing regulations indicate:

(a)  When a commodity on the Procurement List is replaced by another commodity which has not been recently procured, and a nonprofit agency can furnish the replacement commodity in accordance with the Government's quality standards and delivery schedules, the replacement commodity is automatically considered to be on the Procurement List and shall be procured from the nonprofit agency designated by the Committee at the fair market price the Committee has set for the replacement commodity. The commodity being replaced shall continue to be included on the Procurement List until there is no longer a Government requirement for that commodity.

(b)  If contracting activities desire to procure additional sizes, colors, or other variations of a commodity after the commodity is added to the Procurement List, and these similar commodities have not recently been procured, these commodities are also automatically considered to be on the Procurement List.

(c)  In accordance with § 51-5.3 of this chapter, contracting activities are not permitted to purchase commercial items that are essentially the same as commodities on the Procurement List.

41 C.F.R. § 51-6.13 (2020).

In addition, the Federal Acquisition Regulations (FAR), at Title 48 of the Code of Federal Regulations, contains regulations which further implement the JWOD Act. See generally 48 C.F.R. subpart 8.7. With regard to the role of AbilityOne, 48 C.F.R. § 8.703, states:

14

> The Committee maintains a Procurement List of all supplies and services required to be purchased from AbilityOne participating nonprofit agencies. The Procurement List may be accessed at: http://www.abilityone.gov. Questions concerning whether a supply item or service is on the Procurement List may be submitted at Internet email address info@abilityone.gov or referred to the Committee offices at the following address and telephone number: Committee for Purchase From People Who Are Blind or Severely Disabled, 1401 S. Clark Street, Suite 10800, Arlington, VA 22202-3259, 703-603-7740.
>
> Many items on the Procurement List are identified in the General Services Administration (GSA) Supply Catalog and GSA's Customer Service Center Catalogs with a black square and the words "NIB/NISH Mandatory Source," and in similar catalogs issued by the Defense Logistics Agency (DLA) and the Department of Veterans Affairs (VA). GSA, DLA, and VA are central supply agencies from which other Federal agencies are required to purchase certain supply items on the Procurement List.

48 C.F.R. § 8.703 (2021). With a reference to Title 41 of the Code of Federal Regulations, Title 48 of the FAR also lays out purchase priorities for entities of the federal government that wish to purchase items from the Procurement List, stating:

> (a) 41 U.S.C. chapter 85 requires the Government to purchase supplies or services on the Procurement List, at prices established by the Committee, from AbilityOne participating nonprofit agencies if they are available within the period required. When identical supplies or services are on the Procurement List and the Schedule of Products issued by Federal Prison Industries, Inc., ordering offices shall purchase supplies and services in the following priorities:
>  (1) Supplies:
>   (iii) Federal Prison Industries, Inc. (41 U.S.C. 8504).
>   (iv) AbilityOne participating nonprofit agencies.
>   (v) Commercial sources.
>  (2) Services:
>   (vi) AbilityOne participating nonprofit agencies.
>   (vii) Federal Prison Industries, Inc., or commercial sources.
> (b) No other provision of the FAR shall be construed as permitting an exception to the mandatory purchase of items on the Procurement List.
> (c) The Procurement List identifies those supplies for which the ordering office must obtain a formal waiver (8.604) from Federal Prison Industries, Inc., before making any purchases from AbilityOne participating nonprofit agencies.

48 C.F.R. § 8.704 (2021).

The FAR also provides procedures for when the federal government's needs may exceed nonprofit production capability. The regulation at 48 C.F.R. § 8.706 states:

(a) *Ordering offices* may acquire supplies or services on the Procurement List from commercial sources only if the acquisition is specifically authorized in a purchase exception granted by the designated central nonprofit agency.
(b) The central nonprofit agency shall promptly grant purchase exceptions when-
> (1) The AbilityOne participating nonprofit agencies cannot provide the supplies or services within the time required, and commercial sources can provide them significantly sooner in the quantities required; or
> (2) The quantity required cannot be produced or provided economically by the AbilityOne participating nonprofit agencies.
(c) The central nonprofit agency granting the exception shall specify the quantity and delivery or performance period covered by the exception.
(d) When a purchase exception is granted, the contracting officer shall-
> (1) Initiate purchase action within 15 days following the date of the exception or any extension granted by the central nonprofit agency; and
> (2) Provide a copy of the solicitation to the central nonprofit agency when it is issued.
(e) The Committee may also grant a purchase exception, under any circumstances it considers appropriate.

48 C.F.R. § 8.706 (2021) (emphasis in original). With regard to replacement commodities, similar to the JWOD Act implementing regulation at 41 C.F.R. § 51-6.13(a), the JWOD Act implementing regulation at 48 C.F.R. § 8.715 provides that

> [w]hen a commodity on the Procurement List is replaced by another commodity which has not been previously acquired, and a qualified AbilityOne participating nonprofit agency can furnish the replacement commodity in accordance with the Government's quality standards and delivery schedules and at fair market price, the replacement commodity is automatically on the Procurement List and shall be acquired from the AbilityOne participating nonprofit agency designated by the Committee. The commodity being replaced shall continue to be included on the Procurement List until there is no longer a requirement for that commodity.

48 C.F.R. § 8.715 (2021).

On December 1, 2006, AbilityOne published, what it labeled a "Clarification of Scope of Procurement List Additions; 2007 Procurement List," in the Federal Register. See Clarification of Scope Procurement List Additions; 2007 Commodities Procurement List, 71 Fed. Reg. 69,535 (Dec. 1, 2006) (2006 Clarification). In the announcement, which

was not promulgated as a regulation in the Federal Register, AbilityOne addressed proposed procedures for adding products to the Procurement List and announced a three-tiered system: "A List", "B List", and "C List." See id. The 2006 Clarification states with regard to "A List" items:

> The first category (the A List) contains commodity type products that are commonly used in office and light industrial settings. These products, when furnished by the JWOD Program, are widely available through multiple Government and commercial distribution channels, and are delivered to customers in timeframes consistent with industry best practices. For most office supplies, this means on a next-day or two-day basis. For oversize office products (e.g., chair mats), or janitorial/sanitary products, delivery times may be three to five days after receipt of order. "A list" products must be purchased by Federal employees whenever there are available within required timeframes and quantities.

Id. at 69,536 (capitalization in original). With regard to "B-List" items, the 2006 Clarification provides:

> The second category (the B List) contains products that are not used in volume in most offices, but have broad applicability across multiple Federal agencies, and the demand for these items is aggregated by the General Services Administration (GSA). As such, GSA is the JWOD Program's responsible contracting activities for these items on behalf of the rest of the Federal Government, just as GSA fulfills this role for A List items. However, given the B List items' less-than-universal demand, particularly in terms of office use, the B List items are not required to be available through all commercial distribution channels. The B List items are available through the Federal Supply System, as managed by GSA, and will be carried by authorized commercial distributors who carry comparable commercial product families. The JWOD purchasing preference extends to those items and applies to all entities of the Government when such items meet customers' needs and are available in the timeframe and quantities necessary.

Id. (capitalization in original). With regard to "C List" items, the 2006 Clarification states:

> The third category (the C List) contains specialized or niche products (i.e., adapted to a specific function or demand) that are most often designed and manufactured to meet the needs of a single Federal agency, or a group of customers with a unique requirement. These products, when furnished under the JWOD Program, are sponsored by and have procurement preference for the specific Federal agency or agencies that defined the

requirement. The JWOD procurement preference does not apply to Federal Agencies that are not identified on the Procurement List documentation for such items. Generally, C List items are only made available to Federal customers through the distribution channels authorized by the requiring office. If Federal agencies whose requirements are not specified on the Procurement List would like to purchase C list items, they must refer their request to the sponsoring contracting activity. Alternatively, Federal agencies may ask the Committee to change the Procurement List in order to add their agency as an additional contracting Activity.

Id. (capitalization in original).

On August 27, 2010, AbilityOne published a Federal Register Notice, titled "Procurement List Additions," effective September 27, 2010, which added to the Procurement List a series of national stock numbers for the Multi-Camouflage Trouser, stated in this litigation by both parties to have the same national stock numbers as the Women's IHWCU Trousers.[6] See Procurement List Additions, 75 Fed. Reg. 52,724, 52,725 (Aug. 27, 2010). The August 27, 2010 notice stated in part:

**NPAs** [Nonprofit Agencies]: ReadyOne Industries, Inc., El Paso, TX

Goodwill Industries of South Florida, Inc., Miami, FL

**Contracting Activity:** Department of the Army Research, Development, & Engineering Command, Natick, MA.

**Coverage:** C-List for 50% of the requirement of the U.S. Army, as aggregated by the Department of the Army Research, Development, & Engineering Command, Natick, MA.

---

[6] The court notes that both parties strenuously asserted and both parties agreed during the course of the litigation in the above captioned protest that the unisex IHWCU Trousers were added to the Procurement List as a variation of the Multi-Camouflage Trouser. See Procurement List Additions, 75 Fed. Reg. 52,724, 52,725 (Aug. 27, 2010); see also 41 C.F.R. § 51-6.13. The court accepts the protestor's and defendant's definition of the Women's IHWCU Trouser as a replacement item for the unisex IHWCU Trouser and, therefore, as an item that is "automatically considered to be on the Procurement List" as of September 27, 2010. See 41 C.F.R. § 51-6.13. The court observes that the trousers' sizing and designation changed from unisex to female through the January 11, 2021 Notice of Addition published in the Federal Register discussed below. The Administrative Record does not offer details on the differences between the unisex and the female trousers, and neither party alleged that the differences between the unisex and the female trousers was relevant to the above captioned bid protest.

See Procurement List Additions, 75 Fed. Reg. 52,724, 52,725 (Aug. 27, 2010) (emphasis in original; alteration added).

On November 28, 2017, AbilityOne issued a Notice of Addition in which AbilityOne, citing 41 C.F.R. § 51-6.13(b),[7] added the unisex IHWCU Trouser to the Procurement List under Procurement List Number 20105144. The November 28, 2017 Notice indicated:

> **Distribution:** C-List
> **Contracting Activity:** Army Contracting Command – Aberdeen Proving Ground, Natick Contracting Division
> **Mandatory for:** 50% of the requirement of the U.S. Army
> **Designated Mandatory Source(s) of Supply:** Goodwill Industries of South Florida, Inc., Miami, FL, a nonprofit agency associated with SourceAmerica, is authorized to accept orders for the products listed above.

(emphasis in original).

On November 17, 2021, Evan Eisenberg, the contracting officer for the procurement challenged in the above captioned protest, issued a Memorandum for Record which provided the following background:

> The U.S. Army Natick Soldier Systems (Natick) developed the Improved Hot Weather Combat Uniform (IHWCU) to meet the needs of warfighters deployed to hot weather desert and/or tropical locations. Natick serves as the research and development center for the Army. The IHWCU is intended to serve as an alternative to the Army Combat Uniform (ACU) for those environments. The IHWCU consists of a coat and trousers. The initial development and fielding of the IHWCU relied on a unisex sizing tariff that was intended to meet the needs of both male and female warfighters.

The Memorandum for Record continued,

> [a]fter developing and transmitting the SRP [supply request package] for the IHWCU, Natick then developed a more specific sizing tariff and design for female soldiers – the IHWCU-F. Due to congressional inquiries regarding the availability of female specific uniforms and equipment, there was increased pressure on the Army to field the uniforms as quickly as possible.

(alteration added).

---

[7] 41 C.F.R. § 51-6.13(b) provides, in full, that "[i]f contracting activities desire to procure additional sizes, colors, or other variations of a commodity after the commodity is added to the Procurement List, and these similar commodities have not recently been procured, these commodities are also automatically considered to be on the Procurement List."

On January 11, 2021, AbilityOne issued a Notice of Addition which added the Women's IHWCU Trousers to the Procurement List. The January 11, 2021 Notice of Addition stated in its entirety:

## PROCUREMENT LIST

## NOTICE OF ADDITION

TO: Army Contracting Command – Aberdeen Proving Ground, Natick Contracting Division

SourceAmerica

In accordance with 41 CFR 51-6.13(b), the U.S. AbilityOne Commission (Commission) has determined that the following products are additional sizes, colors, or other variations of products already on the Procurement List (PL) and that these products have not recently been procured. Accordingly, the products are automatically considered to be on the PL at the Fair Market Prices (FMP) indicated

**Product Name:**      Trouser, Improved Hot Weather Combat Uniform (IHWCU), Permethrin, Women's, Army

| Product NSN | Size |
|---|---|
| 8415-01-687-6651 | 25-X Short |
| 8415-01-687-6669 | 25-Short |
| 8415-01-687-3100 | 25-Regular |
| 8415-01-687-6659 | 28-A Short |
| 8415-01-687-6201 | 28-Short |
| 8415-01-687-6555 | 28-Regular |
| 8415-01-687-6180 | 28-Long |
| 8415-01-687-1971 | 31-X Short |
| 8415-01-687-1339 | 31-Short |
| 8415-01-687-1353 | 31-Regular |
| 8415-01-687-6673 | 31-Long |
| 8415-01-687-2126 | 31-X Long |
| 8415-01-687-6147 | 35-Short |
| 8415-01-687-2060 | 35-Regular |
| 8415-01-687-1345 | 35-Long |
| 8415-01-687-4018 | 35-X Long |

The following information is applicable to all products listed above

**Product Description:** The Improved Hot Weather Combat Uniform (IHWCU) trouser has one (1) button/buttonhole closure with seven (7) belt loops along with a covered fly with three (3) buttons and buttonhole closure, two (2) side hanging pockets, two (2) front side pleated cargo pockets with three (3) buttons/two (2) buttonholes closure flaps. The trousers include a double needle seat patch and knee reinforcement patches and a mesh fabric attached on the inside of the trousers at the bottom of the legs as inner cuffs. Both the bottom of the trousers legs and the inner cuffs have drawstrings. The trouser is treated with permethrin, wind resistant, and wrinkle free. UOI [Unit of Issue] is PR.

**Unit of issue:** PR
**FMP Category:** Post Treated Garment - Rapid Fielding
**FMP Change Mechanism:** Negotiated
**FOB Origin FMP:** $62.34
**FOB Destination FMP:** $62.50

In accordance with 41 CFR 51-2.7, change to the FMP [Fair Market Price] outside of the approved methodology above and provisions in the U.S. AbilityOne Pricing Policy 51.610, *Pricing AbilityOne Products*, must be approved by the Commission before a contract is awarded or an existing contract is modified.

**Distribution:** C-List

**Contracting Activity:** Army Contracting Command - Aberdeen Proving Ground, Natick Contracting Division

**Mandatory for:** 50% of the requirement of the Department of Defense

**Designated Source of Supply:** Goodwill Industries of South Florida, Inc., Miami, FL, a nonprofit agency associated with SourceAmerica, is authorized to accept orders for the products listed above.

This addition to the Procurement List is effective the date of this notice. In accordance with 41 CFR 51-5.3, this change does not affect contracts for the product awarded prior to the effective date of the Procurement List addition or options exercised under those contracts. Please direct questions regarding this Notice to Operations@abilityone.gov.

(capitalization and emphasis in original; alteration added).[8]

Solicitation No. SPE1C1-21-R-0029, the one at issue in this protest, for the procurement of Women's Improved Hot-Weather Combat Uniform (IHWCU) Trousers was issued by the DLA for troop sustainment on April 26, 2021. As indicated above, protestor argues that according to the Procurement List maintained by the AbilityOne, Goodwill Industries of South Florida is the mandatory source of supply for the Women's IHWCU Trousers and that procurement from any source but Goodwill Industries of South Florida violates procurement statutes and regulations. Protestor's complaint indicates that "Goodwill [Industries of South Florida] has received, has performed, and is performing one or more military contracts for the Goodwill items." Goodwill Industries of South Florida's bid protest complaint alleges that protestor had "received Contract No. W911QY-21-C-0042, to supply the Women's IHWCU Trousers," which "are in production at Goodwill [Industries of South Florida]." (alteration added).

Defendant acknowledges that

> [a]fter the Commission allocated a portion of the Army's requirement for combat pants to the Procurement List, Army-Natick issued a series of product development contracts to Goodwill. See AR Tab 46, at 1053 (Goodwill's project development plan noting that it has produced IHWCU-F trousers "under complete M&D contracts," that is—manufacture and development contracts).

Additionally, defendant acknowledges that Goodwill Industries of South Florida was producing the Women's IHWCU Trousers during what defendant characterizes as the development phase, and that once the design was finalized, AbilityOne issued the January 11, 2021 Notice of Addition, which added the Women's IHWCU Trousers to the Procurement List. Defendant also states that "[a]fter the Commission allocated a portion of the Army's requirement for combat pants to the Procurement List, Army-Natick issued a series of product development contracts to Goodwill," and notes that "Army-Natick's most recent contract with Goodwill [Industries of South Florida] called for 68,991 pants to be delivered in monthly installments in quantities ranging from 2,000 to 6,370." (alteration

---

[8] Protestor's complaint alleges that it received a Notice of Change, dated April 8, 2021, which was similar to the January 11, 2021 Notice of Addition. The April 8, 2021 Notice of Change to the Procurement List that was issued by AbilityOne for the "Army Contracting Command - Aberdeen Proving Ground, Natick Contracting Division," similarly dated April 8, 2021, changed a single Product NSN: 8415-01-687-6555, and noted: "**Product Name:** Trouser, Improved Hot Weather Combat Uniform (IHWCU), Permethrin, Women's, Army, 28-Regular." (capitalization and emphasis in original). AbilityOne then issued a revised Notice of Addition on November 9, 2021, in which AbilityOne changed "the Mandatory for [sic] statement from Department of Defense to U.S. Army." (capitalization in original; alteration added).

added). The defendant indicates that when Army-Natick subsequently proposed to add a portion of its requirement for the Women's IHWCU Trousers to the Procurement List, its estimated annual quantity was contemplated to be 86,688 trousers.

Defendant identifies that the procuring agency, "DLA is a 'defense agency' under the authority, direction, and control of the Department of Defense." See 10 U.S.C. §§ 191–92; see also DoDD 5105.22 (June 29, 2017). Defendant also indicates, with respect to the DLA:

> The agency's primary mission is to "manage[s] [sic] the global supply chain—from raw materials to end user to disposition—for the Army, Marine Corps, Navy, Air Force, Space Force, Coast Guard, 11 combatant commands, other federal agencies, and partner and allied nations." DLA Troop Support requirements are unique given that it is responsible for "manag[ing] the supply chains for food, textiles, construction material, industrial hardware and medical supplies and equipment, including pharmaceuticals." Within DLA Troop Support, the clothing and textiles supply chain "outfit[s] every soldier, sailor, airman and Marine around the world, from their first day of service in boot camp, to camouflage uniforms worn on the battlefield and service dress uniforms."

(capitalization in original; first and third alterations in original; citations omitted).

The regulation at 48 C.F.R. § 8.703 provides that "GSA, DLA, and VA are central supply agencies from which other Federal agencies are required to purchase certain supply items on the Procurement List." 48 C.F.R. § 8.703. In addition, citing to Department of Defense Instruction (DoDI) 4140.63 ¶¶ 2.4, 2.6 (June 7, 2019), defendant explains that "[a]lthough DLA manages various supply chains for the services, the military services' research and engineering arms are typically responsible for developing the products— e.g., Army weapons, Air Force helicopter motors, Navy coats—to meet their particular needs." Because Army-Natick is the research and development center for the Army, as stated in the Army Statement of Work for the Army Combat Pants in the earlier related protest, Goodwill Industries of South Florida, Inc. v. United States, 156 Fed. Cl. 661 (2021) (Goodwill I), submitted as part of the Administrative Record in the current protest, "[w]hen testing a uniform design, Army-Natick often develops a specification and field tests the design with specific units or at specific installations." According to the November 17, 2021 Memorandum for Record by the contracting officer, Evan Eisenberg, also stated, "[p]roduction requirements during research and development are typically narrow," and "Natick generally procures items during the research and development phase of new items when requirements are much smaller." Additionally, the November 17, 2021 Memorandum for Record stated that the efforts undertaken at Army-Natick "'do not typically involve the same or similar scope and magnitude of effort that DLA Troop Support requires for sustainment of the item.'" According to DoDI 4140.63, ¶ 2.3 (Apr. 12, 2019), after Army-Natick completes research and development on a particular item of "DoD clothing and textiles material," Army-Natick may transfer the requirement to the DLA

for the procurement, management, and supply of products made in accordance with that item, which is generally referred to as "sustainment." At the "sustainment" level, the DLA develops acquisition strategies and awards contracts to support Department of Defense requirements. See DoDI 4140.01, at 22 (Mar. 6, 2019). The DLA administers the contracts and awards follow-on contracts to ensure the item's availability until it receives notice that the product is being replaced or discontinued. See id. With respect to the Women's IHWCU Trousers, defendant states that "[h]aving completed the technical design of the combat pants and female improved hot weather trousers, Army-Natick transferred these products to DLA Troop Support for procurement at sustainment levels."

Relevant to the protest at issue, on April 26, 2021, the DLA issued solicitation No. SPE1C1-21-R-0029 to procure the Women's IHWCU Trousers using competitive procedures. The government indicates in its motion for judgment on the Administrative Record that

> DLA Troop Support intends to award two IDIQ contracts—one restricted to small businesses, the other restricted to HUBZone businesses—to procure the female improved hot weather trousers, and to select contractors based on best value. Because DLA Troop Support estimates a combined average requirement of 192,000 trousers per year, awarding two contracts will "ensure that multiple sources are available to provide for the continuous availability of reliable sources of supplies." On December 1, 2021, DLA Troop Support awarded the small business contract, but the agency has not yet awarded the HUBZone contract.

(internal citations omitted).

Prior to filing the instant protest, on May 24, 2021, Goodwill Industries of South Florida filed a pre-award bid protest complaint in this court, challenging the solicitation issued by DLA Troop Support for Army Combat Pants and for Women's IHWCU Trousers, which is also the subject of the above captioned current bid protest. See Goodwill I, 156 Fed. Cl. at 663. In Goodwill I, Goodwill Industries of South Florida sought an injunction prohibiting federal procurement, including by the DLA, of the Women's IHWCU Trousers, as well as the Army Combat Pants, referred to by the protestor as the "Goodwill items," from any entity other than Goodwill Industries of South Florida. Id. at 671.[9] In Goodwill I, Goodwill Industries of South Florida argued that

> [b]ecause Goodwill [Industries of South Florida] is the mandatory source of supply for the Goodwill items, if DLA can issue solicitations for the Goodwill items at all, DLA should require awardees under the Solicitations to acquire

---

[9] In addition to the Women's IHWCU Trousers, there was a second item from the Procurement List at issue in Goodwill I, the Army Combat Pants. See generally Goodwill I, 156 Fed. Cl. 661. The Army Combat Pants are not at issue in this protest.

the Goodwill items from Goodwill [Industries of South Florida]. DLA has not done so. This violates 41 C.F.R. § 51-5.2.

Id. at 671 (alterations added). Therefore, in Goodwill I, Goodwill Industries of South Florida asked this court to enjoin "federal acquisition of the Goodwill items, and any replacement item or variation of the Goodwill items, and any item that is 'essentially the same' or 'similar,' from any source other than Goodwill [Industries of South Florida]." Id. (alteration added). This court dismissed Goodwill I, without prejudice, as unripe. See id. at 680–81. At the time that protestor Goodwill Industries of South Florida filed the protest in Goodwill I, defendant had not yet issued a final solicitation or award for the items at issue in the protest. See id. at 677. Accordingly, this court found that

> for the DLA procurement of the Army Hot-Weather Trousers, no award has been made, and no final solicitation has been issued [for either the Army Combat Pants or the Women's IHWCU trousers]. Although protestor argues that the award of a contract to anyone other than Goodwill [Industries of South Florida] will be a violation of numerous statutes and regulations related to the Procurement List, the anticipation of a future procurement violation is not sufficient to make a claim ripe in a bid protest before the court.

Id. at 675 (alteration added).

Thereafter, Evan Eisenberg, the contracting officer for solicitation No. SPE1C1-21-R-0029, the solicitation now at issue before this court, issued his November 17, 2021 Memorandum for Record which states in part:

> The U.S. Army Natick Soldier Systems (Natick) developed the Improved Hot Weather Combat Uniform (IHWCU) to meet the needs of warfighters deployed to hot weather desert and/or tropical locations. Natick serves as the research and development center for the Army. The IHWCU is intended to serve as an alternative to the Army Combat Uniform (ACU) for those environments. The IHWCU consists of a coat and trousers. The initial development and fielding of the IHWCU relied on a unisex sizing tariff that was intended to meet the needs of both male and female warfighters.
>
> Natick sent a supply request package (SRP) for the unisex IHWCU to DLA Troop Support in 2019. Based on the Army's fielding needs, DLA Troop Support competitively solicited and issued contracts for the IHWCU beginning on December 15, 2020.
>
> After developing and transmitting the SRP for the IHWCU, Natick then developed a more specific sizing tariff and design for female soldiers – the IHWCU-F [Women's IHWCU Trousers]. Due to congressional inquiries regarding the availability of female specific uniforms and equipment, there

was increased pressure on the Army to field the uniforms as quickly as possible. The SRP was approved November 2020, and the Army wanted to begin to be able to issue the IHWCU-F according to its fielding plan in July 2021. The production lead time for the item is 180 days for initial deliveries and 150 days for subsequent deliveries. DLA had to develop an acquisition strategy to try supply the IHWCU-F as close to the Army's desired timeframes as possible while taking into consideration the practical realities of soliciting and awarding contracts having long production lead times.

As part of its initial acquisition planning, DLA Troop Support conducted market research to test the domestic industrial market as to interest and production capabilities. Although requirements for sustaining uniform items after development are routinely transferred to DLA Troop Support via the SRP process, DLA Troop Support does not normally consider performance on Natick contracts as part of its market research analysis. This is because Natick generally procures items during the research and development phase of new items when requirements are much smaller, and the efforts do not typically involve the same or similar scope and magnitude of effort that DLA Troop Support requires for sustainment of the item.

Based on its market research, DLA determined that the solicitation would contain two lots resulting in two long term contracts for these items. Both lots contain the IHWCU-F coats and trousers. One lot is set aside for small businesses and the other lot is set aside for HUBZone small businesses. Because the acquisition timeline would not permit DLA Troop Support to have sufficient quantities of the IHWCU-F coats and trousers available to issue to female personnel starting in July 2021, on December 9, 2020, DLA Troop Support modified a previously-issued solicitation for IHWCU (unisex) coats and trousers to add a portion of its requirements for ICHCU-F coats and trousers. Two contracts were awarded pursuant to that solicitation, each with a monthly maximum of 30,000: SPE1C1-D-1449, awarded on March 9, 2021 (IWHCU coats and IHWCU-F coats); and SPE1C1-21-D-1456, awarded on April 7, 2021 (IWHCU trousers and IHWCU-F trousers). Adding the IHWCU-F to the previously-issued IHWCU solicitation and awards was intended to provide additional support for female personnel until the long-term contracts for the IHWCU-F could be put in place. As a short-term stopgap measure, DLA also requested the Army to place an order under Natick's existing contracts for a quantity of 69,000 IHWCU-F coats and 69,480 IHWCU-F trousers. DLA Troop Support supported the request through a Military Interdepartmental Purchase Request (MIPR) which is a method to transfer funds from one military organization to another. DLA Troop Support was aware that the Army's contracts were with Ability One for the IHWCU-F coats and trousers. Seeking the additional quantities under Natick's contracts was intended to assist DLA Troop

Support with building up the initial inventory needed while contracts were being awarded and production ramped up under the long-term contracts.

(capitalization in original; alteration added). The November 17, 2021 Memorandum for Record continues:

The contracting team discussed the Court's decision with agency counsel and reviewed counsel's memorandum outlining the legal requirements related to items on the PL [Procurement List]. Based on a counsel's comments, and a review of the rules governing acquisitions from Ability One nonprofit agencies/workshops, especially the Commission's *Clarification of Scope of Procurement List Additions; 2007 Commodities Procurement List* 71 Fed. Reg. 69,535, 69,536 (Dec. 1. 2006)), DLA Troop Support does not consider the current identification of the IHWCU-F Trouser or Coat on the C list, with Natick as the designated contracting activity, to indicate that DLA must acquire the item directly from an Ability One nonprofit agency/workshop.

In reaching this decision, DLA Troop Support considered the fact that the Procurement Notice of Addition that added the IHWCU-F to the PL identifies the item as being a C list item, which from the 2006 *Clarification* means that it is a specialized item designed to meet the needs of a single Agency or group of customers. Further the 2006 *Clarification* indicated that the products on the C list are only mandatory for the agency which sponsored them. In this case, Natick has been designated as the Agency that sponsored the addition of the IHWCU-F Coat and Trouser to the PL. DLA Troop Support was not consulted by Natick, an Ability One nonprofit agency or even the Ability One Commission regarding the addition of the IHWCU-F coat or trouser to the PL, and thus had no opportunity to weigh in regarding the scope of future acquisitions that DLA Troop Support may be required to fulfill. Here the current solicitation has a monthly maximum quantity of 13,333 trousers and 13,333 coats for each lot. These quantities are more than double what Goodwill is producing on Natick's contract for the trousers and what Ready One or IOB Greensboro is producing on Natick's contracts for the coat. The identification of the contracting activity on the PL is meaningful, since just because the Ability One Commission determined that one or more workshops can satisfy the needs of Natick, it does not mean that the Ability One Commission has determined that those workshops can satisfy the much larger needs of a different contracting activity such as DLA Troop Support.

While it might be possible to acquire a smaller percentage of the total quantity needed from an Ability One nonprofit workshop, DLA does not consider it to be in the government's best interest to apportion a percentage

to Ability One for the IHWCU-F coats and trousers. When determining the monthly maximums and estimated monthly orders under a contract, DLA Troop Support is taking into consideration reasonable economic production runs needed to keep a production line running. DLA Troop Support also must comply with the requirements of the Competition in Contracting Act (CICA), 10 U.S.C. §2304 which requires that procurements for property must be obtained through full and open competition unless an exception applies. Since the IHWCU-F trouser and coats are not mandatory for DLA Troop Support to acquire from an Ability One nonprofit agency/workshop, there is no basis for DLA Troop Support to order even a small percentage from Ability One unless DLA Troop Support seeks to place a portion on the PL.

In developing an acquisition strategy, and even in considering whether to seek to request that an item, or percent of an item, be placed on the PL as mandatory for DLA Troop Support to acquire, DLA Troop Support considers the domestic industrial base as a whole. Due to the domestic sourcing restrictions of the Berry Amendment (10 U.S.C. 2533a), all uniform items, such as the IHWCU-F Trouser are required to be 100% domestically manufactured, including all the components. There is an extremely limited domestic industrial base that manufactures clothing components from fiber to finished product, and part of DLA Troop Support's acquisition strategy is to ensure that there is sufficient demand and domestic capability to ensure the health and strength of that domestic base. After reviewing its requirements and taking into account the capabilities of commercial domestic manufacturers, DLA Troop Support does not consider it beneficial to seek to request the Ability One Commission to place a portion or percentage of the IHWCU-F trouser or coat on the PL as mandatory for DLA Troop Support because shifting even a small quantity of production away from the commercial acquisitions to Ability One would result in lower monthly production runs which could discourage competition, drive up prices and/or result in companies having to reduce their workforce due to the lower production quantities.

Therefore, based on the above, DLA Troop Support has determined that it is in the government's best interests to continue with its competitive acquisition for the IHWCU-F coats and trousers and not to seek to place these items on the PL as mandatory for DLA Troop Support as the contracting activity, either in whole or part at this time.

(capitalization and emphasis in original).

After solicitation No. SPE1C1-21-R-0029 was issued on April 26, 2021,[10] protestor filed the above captioned post-award bid protest, which similar to Goodwill I, alleges three claims. First, protestor, again, "objects to any solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract for federal procurement of the Goodwill items (or similar items, *etc*.) from anyone other than Goodwill [Industries of South Florida]." (emphasis in original; alteration added). In count two, protestor "seeks injunctive relief prohibiting DLA from procurement of the Goodwill items (or 'similar' items, *etc*.) from anyone other than Goodwill [Industries of South Florida]." (emphasis in original; alteration added). Finally, in count three, protestor alleges that "[b]ecause Goodwill [Industries of South Florida] is the mandatory source of supply for the Goodwill items, if DLA can issue solicitations for the Goodwill items at all, DLA should require awardees under the Solicitations to acquire the Goodwill items from Goodwill [Industries of South Florida]." (alteration added).

After an initial hearing in the protest currently under review, the parties filed cross-motions for judgment on the Administrative Record. In protestor's motion for judgment on the Administrative Record, Goodwill Industries of South Florida argues that if an item is on the Procurement List, it creates a mandatory source of supply for the government, including the DLA. Furthermore, according to protestor: "Goodwill maintains that as the mandatory source of supply, it should not have had to submit a proposal to DLA in order to be awarded this requirement." Goodwill Industries of South Florida also contends that "the presence of the Hot-Weather [the Women's IHWCU] Trousers on the Procurement List mandates that every federal agency, including DLA, purchase these items from Goodwill [Industries of South Florida]." (alterations added). In the defendant's cross-motion for judgment on the Administrative Record, defendant, however, argues that "the JWOD Act does not require all entities of the federal government to procure items on the procurement list through the AbilityOne program," or to procure 100% of their requirements through AbilityOne. Defendant states:

> Goodwill [Industries of South Florida]'s protest rises and falls on its suggestion that the addition of any product on the Procurement List is without limitation such that all portions of the government must procure 100% of their requirements for that product through the AbilityOne program. But no procurement statute or regulation imposes that categorical mandate. On the contrary, at least three [AbilityOne] Commission regulations authorize the Commission to place scope limitations by adding portions of a product requirement to the Procurement List.

---

[10] As indicated above, solicitation No. SPE1C1-21-R-0029 specified the award of two IDIQ contracts, one restricted to small businesses and one restricted to HUBZone businesses. When the above captioned protest was filed, the DLA had awarded one but not both of the contracts. Accordingly, the parties in their documents sometimes refer to the above captioned protest as pre-award and at other times post-award.

(alteration added). Specifically, the government contends that the procurement list applies only to "Army-Natick's purchases of 50% of Army's requirements" of Women's IHWCU Trousers and "[t]he Commission's 2006 clarification further demonstrates that DLA Troop Support is not required to purchase the Female Improved Hot Weather Trousers through the AbilityOne Program."

In response, protestor argues that the Women's IHWCU Trousers are "on the JWOD 'Procurement List,'" and that "[u]nder the JWOD Act (and relevant regulations), the item must be made by a workshop until a rational finding is made that no workshop can make it." Protestor alleges that since "[t]here has been no such finding," and that the "DLA's award of a contract for production of the item to a commercial contractor, instead of a workshop, is a violation of the JWOD Act (and relevant regulations)." After the parties briefed the cross-motions for judgment on the Administrative Record, the court held oral argument. In response to the stated immediate urgency of the protest as represented by the parties, the court subsequently issued its decision orally to the parties. The court's oral decision granted protestor's motion for judgment on the Administrative Record including injunctive relief, effective immediately at the time of the oral decision. As noted above, this Opinion incorporates and memorializes the court's oral decision.

## DISCUSSION

As noted above, protestor and defendant have filed cross-motions for judgment on the Administrative Record. Rule 52.1 (2021) of the Rules of the United States Court of Federal Claims (RCFC) governs motions for judgment on the Administrative Record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006)); see also PGLS, LLC v. United States, 152 Fed. Cl. 59, 67 (2020); Superior Optical Labs, Inc. v. United States, 150 Fed. Cl. 681, 691 (2020) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356–57 (Fed. Cir. 2005)); see also AAR Manufacturing, Inc. v. United States, 149 Fed. Cl. 514, 522 (2020); Glocoms, Inc. v. United States, 149 Fed. Cl. 725, 731 (2020); Centerra Grp., LLC v. United States, 138 Fed. Cl. 407, 412 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1356–57); Informatics Applications Grp., Inc. v. United States, 132 Fed. Cl. 519, 524 (2017); Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016), aff'd, 711 F. App'x 651 (Fed. Cir. 2018); Rotech Healthcare Inc. v. United States, 118 Fed. Cl. 408, 413 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010). Pursuant to RCFC 52.1, in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the Administrative Record. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 481 (2013); see also CR/ZWS LLC v. United States, 138 Fed.

Cl. 212, 223 (2018) (citing <u>Bannum, Inc. v. United States</u>, 404 F.3d at 1353–54).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. <u>See</u> <u>SEKRI, Inc. v. United States</u>, 34 F.4th at 1071 (citing <u>Distributed Sols., Inc. v. United States</u>, 539 F.3d 1340, 1344 (Fed. Cir. 2008); <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001); <u>see also</u> <u>Sys. Application & Techs., Inc. v. United States</u>, 691 F.3d 1374, 1380 (Fed. Cir. 2012) (explaining that the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests). The statute provides that protests of agency procurement decisions are to be reviewed under APA standards, making applicable the standards outlined in <u>Scanwell Labs., Inc. v. Shaffer</u>, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. <u>See, e.g.</u>, <u>Per Aarsleff A/S v. United States</u>, 829 F.3d 1303, 1309 (Fed. Cir. 2016) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), <u>see</u> 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'" (quoting <u>NVT Techs., Inc. v. United States</u>, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) (citing <u>PAI Corp. v. United States</u>, 614 F.3d 1347, 1351 (Fed. Cir. 2010))); <u>Dell Fed. Sys., L.P. v. United States</u>, 906 F.3d 982, 990 (Fed. Cir. 2018); <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332; <u>Res. Conservation Grp., LLC v. United States</u>, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in <u>Scanwell Labs., Inc. v. Shaffer</u>, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); <u>Galen Med. Assocs., Inc. v. United States</u>, 369 F.3d 1324, 1329 (Fed. Cir.) (citing <u>Scanwell Labs., Inc. v. Shaffer</u>, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"), <u>reh'g denied</u> (Fed. Cir. 2004). In <u>Banknote Corp. of Am., Inc. v. United States</u>, 365 F.3d 1345 (Fed. Cir. 2004), the Federal Circuit explained that "[u]nder the APA standard as applied in the <u>Scanwell</u> line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" <u>Id.</u> at 1351 (quoting <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332)); <u>see also</u> <u>Harmonia Holdings Grp., LLC v. United States</u>, 999 F.3d 1397, 1403 (Fed. Cir. 2021); <u>Palantir USG, Inc. v. United States</u>, 904 F.3d 980, 990 (Fed. Cir. 2018); <u>AgustaWestland North Am., Inc. v. United States</u>, 880 F.3d 1326, 1332 (Fed. Cir. 2018); <u>Info. Tech. & Applications Corp. v. United States</u>, 316 F.3d 1312, 1319 (Fed. Cir.), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2003).

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, <u>see</u> <u>Impresa Construzioni Geom. Domenico Garufi v. United</u>

States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir.) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (alterations in original) (quoting Banknote Corp. of Am. v. United States, 365 F.3d at 1350-51 (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000)))), reh'g and reh'g en banc denied (Fed. Cir. 2013). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2018);[11] see also Mitchco Int'l, Inc. v. United States, 26 F.4th 1373, 1384 (Fed. Cir. 2022) (applying the "'arbitrary and capricious'" standard of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), to review of a bid protest) (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Veterans Contracting Grp., Inc. v. United States, 920 F.3d 801, 806 (Fed. Cir. 2019) ("In a bid protest, we follow Administrative Procedure Act § 706 and set aside agency action 'if it is arbitrary, capricious, an abuse of discretion, or otherwise not in

---

[11] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1)  compel agency action unlawfully withheld or unreasonably delayed; and
> (2)  hold unlawful and set aside agency action, findings, and conclusions found to be—
>> (A)  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>> (B)  contrary to constitutional right, power, privilege, or immunity;
>> (C)  in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>> (D)  without observance of procedure required by law;
>> (E)  unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>> (F)  unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

accordance with law.'" (quoting Palladian Partners, Inc. v. United States, 783 F.3d 1243, 1252 (Fed. Cir. 2015)); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); and Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000)." (internal citations omitted)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Synergy Sols., Inc. v. United States, 133 Fed. Cl. 716, 734 (2017) (citing Banknote Corp. of Am. v. United States, 365 F.3d at 1350); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d at 1351), reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285-86) ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure.") (alteration added); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531–32 (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358) ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law."), subsequent determination, 96 Fed. Cl. 119 (2010).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285–86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Dell Fed. Sys., L.P. v. United States, 906 F.3d at 990; Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)); Synergy Sols., Inc. v. United States, 133 Fed. Cl. at 735 (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33). "'"If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Limco Airepair, Inc. v. United States, 130 Fed. Cl. 544, 550 (2017) (citation omitted); Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 631 (2014); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (internal citations omitted), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also Mitchco Int'l, Inc. v. United States, 26 F.4th at 1384; U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6–7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); Sys. Studies & Simulation, Inc. v. United States, 146 Fed. Cl. 186, 199 (2019); By Light Prof'l IT Servs., Inc. v. United States, 131 Fed. Cl. 358, 366 (2017).

In the bid protest currently at issue, the court observes that there are tensions between the objectives of the statutorily and regulatorily established goals of the JWOD Act and the AbilityOne Program, both designed to provide employment opportunities to people who are blind or who are otherwise severely disabled through a mandatory set aside in government procurements for certain products or services, as compared to certain objectives of the Department of Defense (and potentially other agencies) to procure items in a timely fashion, while assuring that necessary quantities of products are available for mission success. In the current protest, the defendant has acknowledged that "[t]he JWOD Act established the AbilityOne program whereby agencies must procure designated products and services on a noncompetitive basis from qualified nonprofit agencies that provide employment opportunities for blind individuals or individuals with severe disabilities." The JWOD Act indicates that the "Committee on its own or in cooperation with other public or nonprofit private agencies may study problems related to the employment of the blind and other severely disabled individuals," and "the development and adaptation of production methods that would enable a greater utilization of the blind and other severely disabled individuals." 41 U.S.C. § 8503. The implementing regulations at 41 C.F.R. § 51-2.2 provide that the "Committee is responsible for carrying

35

out the following functions in support of its mission," including to

> [i]nform Federal agencies about the AbilityOne Program and the statutory mandate that items on the Procurement List be purchased from qualified nonprofit agencies, and encourage and assist entities of the Federal Government to identify additional commodities and services that can be purchased from qualified nonprofit agencies. To the extent possible, monitor Federal agencies' compliance with JWOD requirements.

41 C.F.R. § 51-2.2(e). As discussed above, in the above captioned protest, AbilityOne vigorously aligned itself with the defendant. AbilityOne's counsel signed on to the defendant's briefs, and Kimberly M. Zeich, Deputy Executive Director and Chief Operating Officer of the AbilityOne, provided an unwavering declaration in support of the DLA. At the same time, Ms. Zeich's declaration acknowledged that "[i]n conjunction with other regulations and policies, including the Federal Acquisition Regulation ('FAR'), and unless otherwise excepted, the JWOD Act requires the Federal Government to procure certain products and services from qualified nonprofit agencies (NPA) employing individuals who are blind or are severely disabled." Ms. Zeich, however, stated that "[a]lthough the Commission is a mandatory source of supply for Federal agencies, it is not the singular, mandatory procurement source for Federal agencies in all circumstances." Without further explanation of the JWOD Act's impact on the choices made to proceed with a competitive procurement, Ms. Zeich commented,

> [a]lthough the Commission encourages SourceAmerica and DLA Troop Support to request that the Commission consider whether an NPA, such as Goodwill [Industries of South Florida], would satisfy the suitability criteria with respect to DLA Troop Support's requirements for these products, based on my 13 years of experience administering the Procurement List, I understand that DLA Troop Support is currently under no obligation to procure these specific quantities through the AbilityOne program because DLA Troop Support's requirements for the female IHWCU trousers have not been added to the Procurement List.

Also, important for the analysis in this protest, throughout the proceedings, both protestor and defendant have vigorously urged this court, in their filings with the court and during hearings before the court, that the Women's IHWCU Trousers are items that are currently on the Procurement List. Moreover, in protestor's filings with the court, Goodwill Industries of South Florida consistently has contended that "Goodwill [Industries of South Florida] is both 'capable' and 'desirous' of continuing to furnish the items on the Procurement List, *i.e.,* the Hot-Weather Trousers." (alteration added). Protestor relies on a declaration submitted to the court signed by Mark Marchioli, Vice President of Business Development for Goodwill Industries of South Florida, in which Mr. Marchioli affirmed that "Goodwill is ready, willing, and able to provide these items [the Women's IHWCU Trousers]." (alteration added).

On January 11, 2021, AbilityOne sent a Notice of Addition to the Procurement List which added the Women's IHWCU Trousers to the Procurement List, and which is quoted above. In protestor's motion for judgment on the Administrative Record, based on the JWOD Act and its implementing regulations, protestor argues that when an item is on the Procurement List, a JWOD qualified nonprofit is the mandatory source of supply for the federal government and that federal agencies, including the DLA, must purchase the items from Goodwill Industries of South Florida, or from some other JWOD Act qualified nonprofit. Additionally, protestor argues that "Goodwill [Industries of South Florida] maintains that as the mandatory source of supply, it should not have had to submit a proposal to DLA in order to be awarded this requirement." (alteration added). Protestor also argues that any scope limitations on purchasing Procurement List items have no basis "in the cited statute, nor in the cited regulation [sic]." (alteration added). As noted above, defendant, by contrast, contends that "the JWOD Act does not require all entities of the federal government to procure items on the procurement list through the AbilityOne program."

In a statutory construction analysis, "[t]he first step is 'to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)); see also Republic of Sudan v. Harrison, 139 S. Ct. 1048, 1056 (2019) (quoting Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S, 566 U.S. 399, 412 (2012) ("We begin 'where all such inquiries must begin: with the language of the statute itself.'" (quoting United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989)))); Jimenez v. Quarterman, 555 U.S. 113, 118 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute."); LaBonte v. United States, No. 2021-1432, 2022 WL 3329950, at *8 (Fed. Cir. Aug. 12, 2022) ("We begin our analysis, as we must, with the pertinent statutory language."); Nicely v. United States, 23 F.4th 1364, 1368 (Fed. Cir. 2022) ("When interpreting a statute, we 'begin with the language employed by Congress.'" (quoting Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist., 541 U.S. 246, 252 (2004)); Wright v. Sec'y of Health and Human Servs., 22 F.4th 999, 1004 (Fed. Cir. 2022) ("The 'starting point' in statutory construction 'is the language of the statute' —not a single sentence or word of the statute, but rather 'the provisions of the whole law,' its object, and its policy.") (quoting Dole v. United Steelworkers of Am., 494 U.S. 26, 35 (1990)); AD Global Fund, LLC ex rel. North Hills Holding, Inc. v. United States, 481 F.3d 1351, 1353 (Fed. Cir. 2007) ("The 'first step "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."'" (quoting Barnhart v. Sigmon Coal Co., Inc., 534 U.S. at 450 (quoting Robinson v. Shell Oil Co., 519 U.S. at 340))); Starry Assocs., Inc. v. United States, 892 F.3d 1372, 1377 (Fed. Cir. 2018); PDS Consultants, Inc. v. United States, 907 F.3d at 1357; Bettcher Indus., Inc. v. Bunzl USA, Inc., 661 F.3d 629, 644 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2011); Strategic Hous. Fin. Corp. of Travis Cnty. v. United States, 608 F.3d 1317, 1323 (Fed. Cir. 2010) ("When interpreting any statute, we look first to the statutory language."), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 562

U.S. 1221 (2011). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. at 341 (citing Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 477 (1992); McCarthy v. Bronson, 500 U.S. 136, 139 (1991)); see also King v. Burwell, 576 U.S. 473, 474 (2015) ("[W]hen deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'" (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000))). In construing a statute, courts "'must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'" Schindler Elevator Corp. v. United States, 563 U.S. 401, 407 (2011) (quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 175 (2009) (internal quotation marks omitted)). Even "'[w]hen terms used in a statute are undefined, we give them their ordinary meaning.'" Schindler Elevator Corp. v. United States, 563 U.S. at 407 (quoting Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995)); see also Unicolors, Inc. v. H&M Hennes & Mauritz, L.P., 142 S. Ct. 941 (2022) (using the ordinary or commonplace definition of "knowledge" to interpret statutory text); Wolfe v. McDonough, 28 F.4th 1348, 1354 (Fed. Cir. 2022) ("It is a 'fundamental canon of statutory construction' that 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning [] . . . at the time Congress enacted the statute.'" (quoting Perrin v. United States, 444 U.S. 37, 42 (1979)). "[W]e consider each question [of statutory interpretation] in the context of the statute." Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S/, 566 U.S. at 412 (alteration added) (citing Robinson v. Shell Oil Co., 519 U.S. at 341); Roberts v. Sea-Land Servs., Inc., 566 U.S. 93, 100 (2012); Bush v. United States, 655 F.3d 1323, 1329 (Fed. Cir. 2011), cert. denied, 566 U.S. 1021 (2012).

The initial inquiry into the statutory text ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" Barnhart v. Sigmon Coal Co., 534 U.S. at 450 (quoting Robinson v. Shell Oil Co., 519 U.S. at 340); see also King v. Burwell, 576 U.S. at 474 ("If the statutory language is plain, we must enforce it according to its terms.") (citing Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242, 251 (2010)); Sucic v. Wilkie, 921 F.3d 1095, 1098 (Fed. Cir. 2019) (quoting Barnhart v. Sigmon Coal Co., 534 U.S. at 450); Bettcher Indus., Inc. v. Bunzl USA, Inc., 661 F.3d at 644; Arko Foods Int'l, Inc. v. United States, 654 F.3d 1361, 1364 (Fed. Cir. 2011) ("'[W]here Congress has clearly stated its intent in the language of a statute, a court should not inquire further into the meaning of the statute.'" (quoting Millenium Lumber Distrib., Ltd. v. United States, 558 F.3d 1326, 1328 (Fed. Cir.), reh'g denied (Fed. Cir. 2009)); Am. Airlines, Inc. v. United States, 551 F.3d 1294, 1300 (Fed. Cir. 2008). Thus, when the "'statute's language is plain, "the sole function of the courts is to enforce it according to its terms."'" Johnson v. United States, 529 U.S. 694, 723 (2000) (quoting United States v. Ron Pair Enters., Inc., 489 U.S. at 241 (quoting Caminetti v. United States, 242 U.S. 470, 485 (1917))); see also Jimenez v. Quarterman, 555 U.S. at 118; Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000)); Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States, 617 F.3d at 1361

(citing Sharp v. United States, 580 F.3d at 1237); Candle Corp. of Am. v. U.S. Int'l Trade Comm'n, 374 F.3d 1087, 1093 (Fed. Cir.), reh'g and reh'g denied (Fed. Cir. 2004).

When interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. See Setser v. United States, 566 U.S. 231, 239 (2012) ("Our decision today follows the interpretive rule they invoke, that we must 'give effect . . . to every clause and word' of the Act." (omission in original) (quoting United States v. Menasche, 348 U.S. 528, 538–39 (1955))); see also Alaska Dep't of Env't Conservation v. EPA, 540 U.S. 461, 489 n.13 (2004) ("It is, moreover, "'a cardinal principle of statutory construction'" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or otherwise insignificant."'" (quoting TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001)))); Williams v. Taylor, 529 U.S. 362, 404 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible); Wolfe v. McDonough, 28 F.4th at 1354–55 ("The presumption against surplusage additional provides that a 'Statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'") (quoting Hibbs v. Winn, 542 U.S. 88, 101 (2004) (citing 2A Norman J. Singer, Statutes and Statutory Construction § 46.06, at 18186 (rev. 6th ed. 2000))); Boeing Co. v. Sec'y of the Air Force, 983 F.3d 1321, 1327 (Fed. Cir. 2020) (quoting Shea v. United States, 976 F.3d 1292, 1300 (Fed. Cir. 2020) ("[i]t is a 'cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute.'" (quoting Williams v. Taylor, 529 U.S. at 364))); Sharp v. United States, 580 F.3d 1234, 1238 (Fed. Cir. 2009). Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. See Duncan v. Walker, 533 U.S. at 174 (noting that courts should not treat statutory terms as "surplusage"). "[W]hen two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." Radzanower v. Touche Ross & Co., 426 U.S. 148, 155 (1976); see also Xianli Zhang v. United States, 640 F.3d 1358, 1368 (Fed. Cir. (citing Cathedral Candle Co. v. U.S. Int'l Trade Comm'n, 400 F.3d 1352, 1365 (Fed. Cir. 2005)), reh'g and reh'g en banc denied (Fed. Cir. 2011), cert. denied, 566 U.S. 986 (2012); Hanlin v. United States, 214 F.3d 1319, 1321 (Fed. Cir.), reh'g denied (Fed. Cir. 2000).

The United States Supreme Court also has held that the specific terms of a statute supersede general terms within that statute or within another statute that might otherwise control. See Fourco Glass Co. v. Transmirra Prods. Corp., 353 U.S. 222, 228–29 (1957) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling.") (quoting D. Ginsberg & Sons v. Popkin, 285 U.S. 204, 208 (1932))); see also Bloate v. United States, 559 U.S. 196, 207 (2010); Bulova Watch Co. v. United States, 365 U.S. 753, 761 (1961). In addition, the Supreme Court has endorsed "the 'normal rule of statutory construction' that 'identical words used in different parts of the same act are intended to have the same meaning.'" Gustafson v. Alloyd Co., 513 U.S. 561, 570 (1995) (quoting Dep't of Revenue of Or. v. ACF Indus., Inc., 510 U.S. 332, 342 (1994)); see also Kislev Partners, L.P. ex rel. Bahar v. United States, 84 Fed. Cl. 385,

389, recons. denied, 84 Fed. Cl. 378 (2008). Furthermore, when "Congress has not 'directly spoken to the precise question at issue,'" a court shall sustain the agency's approach "so long as it is 'based on a permissible construction of the statute.'" Auer v. Robbins, 519 U.S. 452, 457 (1997) (citing Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1984)).

Regulatory interpretation uses a similar analytical framework as is applied to statutory interpretation. The court must carefully examine "the text, structure, history, and purpose of a regulation before resorting to deference." See Kisor v. Wilkie, 139 S. Ct. 2400, 2415 (2019) (citing Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. at 843 n.9 (adopting the same approach for ambiguous statutes)). When the text is unambiguous, the court need only read the plain language of the regulation. See Breland v. McDonough, 22 F.4th 1347, 1353 (Fed. Cir. 2022); see also Bauer v. Fed. Deposit Ins. Corp., 38 F.4th 1114, 1121 n.2 (D.C. Cir. 2022) (stating that it was unnecessary to apply Chevron deference when the "Federal Deposit Insurance Act and its implementing regulations" were straight forward and were not ambiguous). A Judge of the United States Court of Federal Claims explained:

> This Court construes a regulation in the same way as a statute. Tesoro Haw. Corp. v. United States, 405 F.3d 1339, 1346–47 (Fed. Cir. 2005) (citing Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414–15 (1945)). The Court's analysis of a regulation begins with the plain language of the regulation. See Barnhart v. Sigmon Coal Co., 5334 U.S. 438, 450 (2002) ("As in all statutory construction cases we begin with the language of the statute."). If the regulatory language is clear and unambiguous, then the Court does not need to conduct any further inquiry. Robert v. Dep't of Navy, 440 F.3d 1341, 1350 (Fed. Cir. 2006).

Johnson v. United States, 157 Fed. Cl. 8, 18 (2021).

The United States Supreme Court in Kisor v. Wilkie wrote,

> for not every reasonable agency reading of a genuinely ambiguous rule should receive Auer deference. See Auer v. Robbins, 519 U.S. at 457. We have recognized in applying the Auer case that a court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight.

Kisor v. Wilkie, 139 S. Ct. at 2416 (citing Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 155 (2012)).[12] By way of example, the Supreme Court in Kisor v. Wilkie

---

[12] Although not a precedential decision, as recently indicated by the United States Court of Appeals for the Federal Circuit, an agency will receive Auer deference only if a

identified "some especially important markers for identifying when <u>Auer</u> deference is and is not appropriate," including "the regulatory interpretation must be one actually made by the agency," "the agency's interpretation must in some way implicate its substantive expertise," and "[f]inally, an agency's reading of a rule must reflect 'fair and considered judgment' to receive <u>Auer</u> deference." <u>Kisor v. Wilkie</u>, 139 S. Ct. at 2416–17. Further, the "Court does not interpret statutes and regulations in a vacuum, the Court looks to other relevant regulations in the same title." <u>Cully Corp. v. United States</u>, 160 Fed. Cl. 360, 378 (2022). The statutory language which lays out the goals of the JWOD Act is clear and not ambiguous as quoted above. The implementing regulations of the JWOD Act also are clear and not ambiguous as stating the requirements of how to proceed to award government contracts under the JWOD Act implementing regulations. <u>See</u> <u>Breland v. McDonough</u>, 22 F.4th at 1353; <u>see also</u> <u>Bauer v. Federal Dep't of Ins. Corp.</u>, 38 F.4th at 1121 n.2.

As it relates to the above captioned protest, protestor notes that 48 C.F.R. § 8.703 specifically references the DLA. Protester quotes the regulation at 48 C.F.R. § 8.704, which states, in part:

(a) 41 U.S.C. chapter 85 [titled "Committee for Purchase From People Who Are Blind or Severely Disabled"] requires the Government to purchase supplies or services on the Procurement List, at prices established by the Committee, from AbilityOne participating nonprofit agencies if they are available within the period required . . . .

(b) No other provision of the FAR shall be construed as permitting an exception to the mandatory purchase of items on the Procurement List.

48 C.F.R. § 8.704 (alterations added). Protestor also cites the regulation at 48 C.F.R. § 8.703, which states:

Many items on the Procurement List are identified in the General Services Administration (GSA) Supply Catalog and GSA's Customer Service Center Catalogs with a black square and the words "NIB/NISH [National Industries for the Blind/National Industries for the Severely Handicapped] Mandatory Source," and in similar catalogs issued by the Defense Logistics Agency (DLA) and the Department of Veterans Affairs (VA). GSA, DLA, and VA are central supply agencies from which other Federal agencies are required to purchase certain supply items on the Procurement List.

<u>Id.</u> Moreover, protestor quotes 48 C.F.R. § 8.705-1(b), which states that "[s]upply distribution facilities in DLA and GSA shall obtain supplies on the Procurement List from the central nonprofit agency identified or its designated AbilityOne participating nonprofit

---

regulation "is genuinely ambiguous and only if the interpretation is reasonable," and reflects the agency's "authoritative, expertise-based, fair, or considered judgment." <u>Davis v. McDonough</u>, No. 2021-1904, 2022 WL 2824673, at *2 (Fed. Cir. July 20, 2022).

agency." 48 C.F.R. § 8.705-1(b). Furthermore, citing to 41 C.F.R. § 51-6.13,[13] "Replacement and similar commodities," and 48 C.F.R. § 8.715, "Replacement commodities," protestor highlights that "this mandatory source of supply applies not only to listed items, but also — 'automatically' – 'to replacement commodities,' 'variations,' and 'essentially the same,' or 'similar' items."

At the oral argument, and in its motion for judgment on the Administrative Record, protestor's counsel relied on the decision in PDS Consultants, Inc. v. United States, 907 F.3d 1345, to support protestor's position that the word "shall" in the JWOD Act, in 41 U.S.C. § 8504(a),[14] "means it's required. It's not optional or anything short of absolutely

---

[13] 41 C.F.R. § 51-6.13 provides in its entirety:

(a)  When a commodity on the Procurement List is replaced by another commodity which has not been recently procured, and a nonprofit agency can furnish the replacement commodity in accordance with the Government's quality standards and delivery schedules, the replacement commodity is automatically considered to be on the Procurement List and shall be procured from the nonprofit agency designated by the Committee at the fair market price the Committee has set for the replacement commodity. The commodity being replaced shall continue to be included on the Procurement List until there is no longer a Government requirement for that commodity.

(b)  If contracting activities desire to procure additional sizes, colors, or other variations of a commodity after the commodity is added to the Procurement List, and these similar commodities have not recently been procured, these commodities are also automatically considered to be on the Procurement List.

(c)  In accordance with § 51-5.3 of this chapter [41 C.F.R.], contracting activities are not permitted to purchase commercial items that are essentially the same as commodities on the Procurement List.

41 C.F.R. § 51-6.13.

[14] As quoted above, 41 U.S.C. § 8504(a) states:

An entity of the Federal Government intending to procure a product or service on the procurement list referred to in section 8503 of this title shall procure the product or service from a qualified nonprofit agency for the blind or a qualified nonprofit agency for other severely disabled in accordance with the regulations of the Committee and at the price the Committee establishes if the product or service is available within the period required by the entity.

mandated by the statute." See PDS Consultants, Inc. v. United States, 907 F.3d at 1357. In PDS Consultants, Inc. v. United States, the United States Court of Appeals for the Federal Circuit, in considering the same section of the JWOD Act, 41 U.S.C. § 8504(a), explained that "[t]he JWOD generally requires that federal agencies, which on its face would include but not be limited to the VA, purchase products and services on the [Procurement] List from designated nonprofits." PDS Consultants, Inc. v. United States, 907 F.3d at 1349 (alteration added). In PDS Consultants, Inc. v. United States, the Federal Circuit also explained that "[r]egulations promulgated under the JWOD Act mandate that AbilityOne, when deciding what items to place on the [Procurement] List, consider, among other things, the additional service or commodity's potential to generate employment, the nonprofit agency's qualifications and capability to meet Government standards and schedules, and the impact on private contractors." Id. (citing 41 C.F.R. § 51-2.4) (alteration added).

At the oral argument, protestor's counsel also cited Superior Optical Labs, Inc. v. United States, 150 Fed. Cl. 681, 685 (2020), to argue that "the Javits-Wagner-O'Day Act requires all government agencies – that's the word that's in the decision, all – to purchase certain products and services from designated nonprofits that employ blind and otherwise disabled people." A Judge of the United States Court of Federal Claims in Superior Optical Labs, Inc. v. United States stated, "[t]he Javits-Wagner-O'Day Act ('JWOD'), 41 U.S.C. §§ 8501–06, requires all government agencies, including the VA, to purchase certain products and services from designated non-profits that employ blind and otherwise disabled people. Congress enacted the JWOD to provide employment opportunities for the blind and 'other severely disabled' individuals." Superior Optical Labs, Inc. v. United States, 150 Fed. Cl. at 685; see also Top Gun Servs., LLC v. United States, 150 Fed. Cl. 696, 700 (2020) ("Once the Committee determines that a good or service is suitable for procurement from a qualified nonprofit agency, the Committee places that item on a published Procurement List and a federal agency wishing to obtain that item must do so through a qualified nonprofit agency. 41 U.S.C. § 8503."); Bona Fide Conglomerate, Inc. v. United States, 96 Fed. Cl. 233, 236 (2010) ("Once a good or service is added to the Procurement List, government entities—including executive agencies—are required to procure the good or service from a qualifying nonprofit agency ('NPA') at a price established by the Committee. 41 U.S.C. §§ 48, 48(c)[15]; FAR 8.704.") (alteration added).

Protestor asserts that no exceptions exist in the JWOD Act and its implementing regulations, which allow an agency not to procure Procurement List commodities or services from JWOD qualified nonprofits, other than when the items to be procured

---

Id.

[15] The provision of the JWOD Act formerly at 41 U.S.C. § 48 has been recodified at 41 U.S.C. § 8504, and the provision of the JWOD Act formerly at 41 U.S.C. § 48c has been recodified at 41 U.S.C. § 8506.

cannot be produced by a qualified nonprofit in sufficient quantities and/or within the required timeframe for the procuring agency.[16] Protestor argues:

> By its plain meaning, and under controlling legal authority, the JWOD Act itself expressly is Government-wide as long as "the product or service [is][17] available within the period required by the" agency [41 U.S.C. § 8504(a)]; the JWOD Act clearly does not provide for, or even contemplate, set-asides "in whole or in part." All seven of these decisions of this Court[18]—and a Federal Circuit decision, as well—cite the JWOD Act for the proposition that the JWOD Act set-asides automatically extend throughout the entire Federal Government. None of them suggests that the JWOD Act permits the Committee to add an item to the Procurement List "in whole or in part."

(first and third alterations in original).

On April 26, 2021, the DLA issued solicitation No. SPE1C1-21-R-0029 for Women's IHWCU Trousers, indicating that there were

> two Lots for this solicitation, one set aside for HUBZone small business concerns and one set aside for Small Business concerns. The Government intends to award one contract per lot, making awards based upon an integrated assessment of technical factors and price resulting in the best value to the Government.

(capitalization in original). Solicitation No. SPE1C1-21-R-0029 was not restricted to Goodwill Industries of South Florida, or to other JWOD Act qualified nonprofit agencies or workshops. At the time solicitation No. SPE1C1-21-R-0029 was issued, protestor had been producing the Women's IHWCU trousers for Army-Natick through a merchandise and development contract, which had been issued to Goodwill Industries of South Florida consistent with the requirements of the Procurement List. Protestor alleges that because Goodwill Industries of South Florida is a qualified nonprofit agency and because the DLA

---

[16] There is an exception, however, for "an industry established under chapter 307 of title 18 and that is required under section 4124 of title 18 to be procured from that industry," 41 U.S.C. § 8504(b), a reference to "Purchase of prison-made products by Federal departments." 18 U.S.C. § 4124 (2018).

[17] The court finds it curious that protestor added brackets around "[is]" since the JWOD Act contains the word "is." See 41 U.S.C. § 8504(a).

[18] Overall, the protestor refers to seven cases as relevant to the instant protest: PDS Consultants, Inc. v. United States, 132 Fed. Cl. 117; Melwood Horticultural Training Ctr., Inc. v. United States, 153 Fed. Cl. 723; Top Gun Servs., LLC v. United States, 150 Fed. Cl. 696; Superior Optical Labs, Inc. v. United States, 150 Fed. Cl. at 685; American Innotek, Inc. v. United States, 128 Fed. Cl. 135 (2016); Akima Intra-Data, LLC v. United States, 119 Fed. Cl. 520 (2014); Bona Fide Conglomerate, Inc. v. United States, 96 Fed. Cl. 233.

is an "entity of the federal government," the DLA violated the JWOD Act and implementing regulations, by issuing a competitive solicitation, rather than seeking the production of the items from one of the nonprofit organizations contemplated by the JWOD Act. Further, at oral argument, protestor's counsel stated that "[i]t's not a normal thing for DLA to be doing what it's doing here and using commercial sources for an item that's been procured from the JWOD suppliers since time immemorial." Protestor also asserts that there was no finding by SourceAmerica, the appropriate central nonprofit agency, or by AbilityOne that a qualified nonprofit organization or organizations would not be able to meet the quantity and deadline requirements for the DLA and that absent such finding, any scope limitations by the government violate the JWOD Act and its implementing regulations.

As indicated above, defendant responds that "[t]he JWOD Act does not require all entities of the federal government to procure items on the Procurement List through the AbilityOne Program." Defendant, citing 41 U.S.C. § 8504(a) argues that

> the statute does not provide that products on the Procurement List must be procured by all entities of the Government. Rather, the statute provides that "[a]n entity of the Federal Government intending to procure a product or service on the procurement list [referred to in 41 U.S.C. § 8503] shall procure the product or service from a qualified nonprofit agency for the blind or a qualified nonprofit agency for other severely disabled *in accordance with regulations of*" the Commission [AbilityOne and at the price AbilityOne establishes if the product or service is available within the period required by the entity].

(emphasis in original; alterations added). Additionally, defendant argues that the JWOD Act and its implementing regulations allow an exception to the Competition in Contracting Act and, cites to 41 U.S.C. ch. 85. Defendant argues that AbilityOne regulations authorize AbilityOne to place scope limitations on the Procurement List by adding only portions of a product requirement to the Procurement List. First, defendant points to the regulation at 41 C.F.R. § 51-2.8(b) which provides that the Procurement List "identifies the name and national stock number or item designation for each commodity, and where appropriate, any limitation on the portion of the commodity which must be procured under the JWOD Act." 41 C.F.R. § 51-2.8(b). Second, defendant cites 41 C.F.R. § 51-2.5 which provides that AbilityOne may "add a commodity or service in whole or in part to the Procurement List." 41 C.F.R. § 51-2.5. Third, defendant argues that 41 C.F.R. § 51-5.3(a) authorizes AbilityOne to "place scope parameters and allocate a portion of the requirement to the Procurement List," and that "[w]here geographic areas, quantities, percentages or specific supply locations for a commodity are listed, the mandatory provisions of the JWOD Act apply only to the portion or portions of the commodity indicated by the Procurement List." 41 C.F.R. § 51-5.3(a). Defendant further argues that in the protest currently before the court, "the plain language of the Procurement List additions make clear that the additions apply only to (1) Army-Natick purchases of (2) 50% of the Army's requirements," as opposed to all entities of the federal government. Therefore, defendant argues, Goodwill Industries of South Florida "simply is not a

45

mandatory source of supply for 100% of *all* Federal entities' product requirements." (emphasis in original).

Protestor responds

if AbilityOne actually had clearly and unequivocally stated in the Procurement List that only 50% of Army-Natick's contractual requirements for [sic] were being set aside for workshops, then under the JWOD Act's "suitability" standard, *that* would have been "arbitrary and capricious." There is no record here that establishes that 50% of Army-Natick's contractual requirements for the IHWCU-F trousers, and 0% of all other federal contracting activities' requirements, are "suitable" for workshop production. On the contrary, 100% of the requirements for IHWCU-F trousers up to this time *have been* made by workshops, and by all appearances, 100% of the item remains "suitable" for such production in the future.

(emphasis in original; alteration added).

The court notes that the statutory language of the JWOD Act plainly provides:

An entity of the Federal Government intending to procure a product or service on the procurement list referred to in section 8503 of this title [41] <u>shall</u> procure the product or service from a qualified nonprofit agency for the blind or a qualified nonprofit agency for other severely disabled in accordance with regulations of the Committee and at the price the Committee establishes if the product or service is available within the period required by the entity.

41 U.S.C. § 8504(a) (emphasis and alteration added). Similarly, the regulatory language of the JWOD Act provides:

(a) Nonprofit agencies designated by the Committee are <u>mandatory sources of supply</u> for <u>all</u> entities of the Government for commodities and services included on the Procurement List, as provided in § 51-1.2 of this chapter.

(b) Purchases of commodities on the Procurement List by entities of the Government <u>shall</u> be made from sources authorized by the Committee. These sources may include nonprofit agencies, central nonprofit agencies, Government central supply agencies such as the Defense Logistics Agency and the General Services Administration, and certain commercial distributors. Identification of the authorized sources for a particular commodity may be obtained from the central nonprofit agencies at the addresses noted in § 51-6.2 of this chapter.

(c) Contracting activities <u>shall</u> require other persons providing commodities which are on the Procurement List to entities of the Government by

contract to order these commodities from the sources authorized by the Committee.

41 C.F.R. § 51-5.2(a)–(c) (emphasis added). Further, the regulatory framework of the JWOD Act uses mandatory language, stating that "[t]he Committee maintains a Procurement List which includes the commodities and services which shall be procured by Government departments and agencies under the JWOD Act from the nonprofit agency(ies) designated by the Committee." 41 C.F.R. § 51-2.8(a) (emphasis added). The mandatory language of the JWOD Act and implementing regulations, as noted above, does not differentiate among federal entities which wish to procure items on the Procurement List. Only specific statutory exceptions, such as those pertaining to the prison industries provision, see 41 U.S.C. § 8504(b), are situations in which a qualified nonprofit or multiple nonprofits cannot provide the product or service identified by the agency "within the period required by the entity." See 41 U.S.C. § 8504(a). The implementing regulations provide the procedures for when a qualified nonprofit cannot meet the deadline required by a federal entity.

The regulation at 41 C.F.R. § 51-6.7 which governs "Orders in excess of nonprofit agency capability," provides:

> Nonprofit agencies shall take those actions necessary to ensure that they can ship commodities within the time frames specified by the Government. In instances where the nonprofit agency determines that it cannot ship the commodity in the quantities specified by the required shipping date, it shall notify the central nonprofit agency and the contracting activity. The central nonprofit agency shall request a revision of the shipping schedule which the contracting activity should grant, if feasible, or the central nonprofit agency shall issue a purchase exception authorizing procurement from commercial sources as provided in § 51-5.4 of this chapter.

41 C.F.R. § 51-6.7(b). Moreover, as indicated in 41 C.F.R. § 51-6.7(b), the regulation at 41 C.F.R. § 51-5.4 provides the procedures for obtaining a purchase exception for a Procurement List included item:

(a)  A central nonprofit agency will normally grant a purchase exception for a contracting activity to procure from commercial sources commodities or services on the Procurement List when both of the following conditions are met:
(1) The central nonprofit agency or its nonprofit agency(ies) cannot furnish a commodity or service within the period specified, and
(2) The commodity or service is available from commercial sources in the quantities needed and significantly sooner than it will be available from the nonprofit agency(ies).

(b) The central nonprofit may grant a purchase exception when the quantity involved is not sufficient to be furnished economically by the nonprofit agenc(ies).

(c) The Committee may also grant a purchase exception for the reasons set forth in paragraphs (a) and (b) of this section.

41 C.F.R. § 51-5.4(a)–(c). Therefore, if a nonprofit determines that it cannot furnish Procurement List items to the procuring agency by the deadline required, see 41 C.F.R. § 51-6.7, or if AbilityOne or an appropriate central nonprofit agency, finds that a qualified nonprofit or combination of nonprofits would not be able to meet the deadline, then the appropriate central nonprofit agency or AbilityOne is authorized under the JWOD Act implementing regulations to issue a purchase exception to the procuring agency to obtain Procurement List items from commercial suppliers. See 41 C.F.R. § 51-5.4. Also, in instances in which the appropriate central nonprofit agency properly finds that JWOD qualified nonprofits "cannot provide the supplies or services within the time required, and commercial sources can provide them significantly sooner in the quantities required," 48 C.F.R. § 8.706(b)(1), or when "[t]he quantity required cannot be produced or provided economically by an AbilityOne participating nonprofit agencies, the central nonprofit agency granting the exception shall specify the quantity and delivery or performance period covered by the exception." 48 C.F.R. § 8.706(b)–(c); see also SEKRI, Inc. v. United States, 34 F.4th at 1068 ("[P]urchase exceptions are appropriate under the FAR when the nonprofit agency cannot provide the commodities in sufficient quantities or cannot meet the required deadline.").

In addition, AbilityOne "may, by rule made in accordance with the requirements of section 553(b) to (e) of title 5, add to and remove from the procurement list products so produced and services so provided." 41 U.S.C. § 8503(b); see also PDS Consultants v. United States, 907 F.3d at 1349 (AbilityOne "can make changes to the [Procurement] List by posting notice in the Federal Register and following the notice and comment procedures set forth in the Administrative Procedure Act.") (alteration in original). With only a few specific exceptions, identified above, the unambiguous words of limitation in the JWOD Act statutory language, state, "if the product or service is available within the period required by the entity," allows a limitation on the mandatory source requirement only when AbilityOne or the appropriate central nonprofit agency has determined that a qualified nonprofit or qualified nonprofits cannot furnish the products in the timeframe required by the procuring agency. As explained by the United States Supreme Court, "[i]f the statutory language is plain, we must enforce it according to its terms." King v. Burwell, 576 U.S. at 474 (citing Hardt v. Reliance Standard Life Ins. Co., 560 U.S. at 251).

In SEKRI, Inc. v. United States, 34 F.4th 1063, the United States Court of Appeals for the Federal Circuit stated that "the AbilityOne Program is a complex system of government procurement that imposes specific obligations on the government, central nonprofit organizations, and nonprofit agencies that employ the blind and severely

48

disabled." Id. at 1072. Although discussing the issue of standing, the Federal Circuit acknowledged that JWOD qualified nonprofits like protestor SEKRI, Inc.

> have established economic interest bona fides because they have been qualified under the AbilityOne Program and are a mandatory source. Congress has established that such entities must be prioritized over other commercial sources, absent special circumstances. See 41 U.S.C. § 8504(a); see also 41 C.F.R. § 51–5.4 (providing for purchase exceptions); 48 C.F.R. § 8.706 (same).

SEKRI, Inc. v. United States, 34 F.4th at 1072. In addition, The Federal Circuit continued,

> it would not make sense to impose upon mandatory sources an affirmative obligation to monitor the federal government's solicitations to identify attempts to circumvent the AbilityOne Program and immediately bring agency protests, especially where the JWOD Act places an affirmative obligation on procuring agencies to determine whether the procurement is subject to a mandatory source. Here, the onus is on the procuring agency, not the nonprofit agency participating in the AbilityOne Program. See 41 U.S.C. § 8504(a) (requiring federal procuring agencies to procure certain goods from a qualified nonprofit agency under the AbilityOne Program); see also 41 C.F.R. §§ 51–1.2(a), 51–5.2. This is not to say that procuring agencies have no way out of the JWOD procurement regime. To lawfully procure the ATAP from a commercial source other than SEKRI through competitive bidding, the government should have obtained a purchase exception from SourceAmerica or the Committee. See 41 C.F.R. § 51–5.4; 48 C.F.R. § 8.706. The government does not show that it ever obtained, or even sought, a purchase exception. On the record before us, therefore, the government was required to procure the ATAP [Advanced Tactical Assault Panel] from SEKRI using the appropriate process under the AbilityOne Program. See 41 C.F.R. §§ 51–5.4, 51–6.1 (direct order process), 51–6.2 (allocation process); 48 C.F.R. §§ 8.705–2 (direct order process), 8.705–3 (allocation process).

SEKRI, Inc. v. United States, 34 F.4th at 1072–73 (alteration added).

Separate from the recent Federal Circuit decision in SEKRI, Inc. v. United States, a number of earlier decisions issued by Judges of the United States Court of Federal Claims are consistent with this court's interpretation regarding the mandatory nature of the JWOD Act and its implementing regulations. In Melwood Horticultural Training Center, Inc. v. United States, 153 Fed. Cl. 723, a Judge of this court wrote:

> Once a product or service is added to the Procurement List, it remains in the AbilityOne program unless the Commission "determines that none of the nonprofit agencies participating in the AbilityOne Program are capable

and desirous of furnishing the commodity or service to the Government, or if [AbilityOne] decides that the commodity or service is no longer suitable for procurement from nonprofit agencies employing people who are blind or have severe disabilities."

Id. at 731 (alteration in original). In Top Gun Services, LLC v. United States, a Judge of this court wrote:

Once the Committee determines that a good or service is suitable for procurement from a qualified nonprofit agency, the Committee places that item on a published Procurement List and a federal agency wishing to obtain that item must do so through a qualified nonprofit agency. 41 U.S.C. § 8503. There are specific requirements and conditions that nonprofit agencies must satisfy to participate, and the Committee is required to maintain and publish in the Federal Register the list of products and services deemed suitable for procurement through AbilityOne. 41 U.S.C. § 8503(a). The Act does not define the suitability standard, but states that the Committee "may prescribe regulations regarding specifications for products and services on the procurement list . . . and other matters as necessary to carry out this chapter." 41 U.S.C. § 8503(c).

Top Gun Servs., LLC v. United States, 150 Fed. Cl. at 700–01 (alteration in original).[19]

The regulation at 41 C.F.R § 51-2.8(b), cited by defendant in support of its arguments, provides that "[f]or commodities, including military resale commodities, the Procurement List identifies the name and national stock number or item designation for each commodity, and where appropriate, any limitation on the portion of the commodity which must be procured under the JWOD Act." 41 C.F.R. § 51-2.8(b). Defendant asserts that this language in 41 C.F.R § 51-2.8(b) allows AbilityOne to limit the procurement of the Women's IHWCU Trousers by JWOD Act qualified nonprofit organizations to Army-Natick, and, therefore, permits other federal entities, such as the DLA, to obtain Procurement List items elsewhere, and in competitive procurements.

---

[19] The court notes that in Top Gun Servs., LLC v. United States, although the Judge found that protestor did not have standing to bring the protest, the Judge offered helpful guidance on the operation of the JWOD Act in federal procurements: "'[A] service that is added to the procurement list may only be contracted through the [qualified nonprofit agency] contractor selected by' the AbilityOne Commission." Top Gun Servs., LLC v. United States, 150 Fed. Cl. at 705 (alterations in original) (quoting Akima Intra-Data, LLC v. United States, 119 Fed. Cl. at 545).

Contrary to the defendant's position, the regulation at 41 C.F.R. § 51-2.8(b) and the words "any limitation on the portion of the commodity which must be procured under the JWOD Act," does not allow for limitation as to which agency or subset of an agency is obligated to procure a Procurement List item pursuant to the JWOD Act from JWOD Act qualified nonprofit organizations.  The language in 41 C.F.R. § 51-2.8(b), "and where appropriate, any limitation on the portion of the commodity" when read with the JWOD Act statutory language in 41 U.S.C. § 8504(a) and JWOD Act implementing regulatory language in 41 C.F.R. §§ 51-2.8, 51-6.7(b), 51-5.4; and 48 C.F.R. § 8.706, does not change the fundamental mandatory guidance regarding agency acquisition of Procurement List items. The JWOD Act implementing regulations direct that Only after AbilityOne or the appropriate central nonprofit agency, find that the qualified nonprofit organizations cannot produce the requested order by the procuring government agency "within the time required," 48 C.F.R. § 8.706(b), can AbilityOne or the appropriate central nonprofit agency place a limit on the number of Procurement List items that must be procured from qualified nonprofits.  See 41 C.F.R. § 51-5.4(a)–(c). Alternatively, if the qualified nonprofit producing the items concludes "that it cannot ship the commodity in the quantities specified by the required shipping date, it shall notify the central nonprofit agency and the contracting activity," and the appropriate central nonprofit agency is authorized to either (1) "request a revision of the shipping schedule" for the required items, or (2) "the central nonprofit agency shall issue a purchase exception authorizing procurement from commercial sources." 41 C.F.R. § 51-6.7(b).  Only after AbilityOne or the appropriate central nonprofit agency grants a purchase exception to procure the remainder of the items from a non-JWOD Act qualified source, can the item to be procured from a commercial supplier or a different set aside source. See 41 C.F.R. § 51-5.4.

This reading of 41 C.F.R. § 51-2.8(b) is consistent with the policy of the JWOD Act and its implementing regulations, which were designed specifically to "increase employment and training opportunities for persons who are blind or have other severe disabilities through the purchase of commodities and services from qualified nonprofit agencies employing persons who are blind or have other severe disabilities." See 41 U.S.C. § 8504(a); see also 41 C.F.R. § 51-1.1(a). The regulation at 41 C.F.R. § 51-2.8(b) does not give AbilityOne, the appropriate central nonprofit agency, or a procuring government agency blanket discretion when to alter how Procurement List items must be acquired, add a scope or source limitations to an item on the Procurement List, or proceed with issuing a competitive solicitation, without taking the necessary identified steps under the JWOD Act and the JWOD Act implementing regulations to determine the capability of JWOD qualified nonprofits to produce the items on the Procurement List.

Because both the DLA and Army-Natick are federal entities within the United States Department of Defense, they are specifically subject to the requirements of the JWOD Act and its implementing regulations when it comes to a federal entity procuring Procurement List items. As noted above, the DLA is specifically listed in the applicable regulation at 48 C.F.R. § 8.703 which provides, in relevant part, "GSA, DLA, and VA are central supply agencies from which other Federal agencies are required to purchase

certain supply items on the Procurement List." Id. In SEKRI, Inc. v. United States, the Federal Circuit indicated:

> If supplies are identified on the procurement list as available from the Defense Logistics Agency ("DLA") or the General Services Administration ("GSA") supply distribution facilities, then the supplies *must* be obtained through those facilities, and in turn DLA and GSA "*shall obtain* the supplies . . . from [SourceAmerica] or its designated AbilityOne participating nonprofit agency." See id. § 8.705–1 (emphasis added).

SEKRI v. United States, 34 F.4th at 1068 (emphasis, ellipses, and brackets in original). The language of the JWOD Act does not generally provide for exclusions for the DLA or other federal government entities from its broad application. By issuing the competitive solicitation and making an award pursuant to the competitive solicitation without following the required procedures, as is discussed more fully below, the defendant failed to comply with the JWOD statutory and implementing regulatory requirements. See 41 U.S.C. § 8504(a) ("An entity of the Federal Government intending to procure a product or service on the procurement list referred to in section 8503 of this title shall procure the product or service from a qualified nonprofit agency for the blind or a qualified nonprofit agency for other severely disabled in accordance with regulations of the Committee and at the price the Committee establishes if the product or service is available within the period required by the entity."); see also 48 C.F.R. § 8.706(b) ("Ordering offices may acquire supplies or services on the Procurement List from commercial sources only if the acquisition is specifically authorized in a purchase exception granted by the designated central nonprofit agency.").

To defend its position on the propriety of using a competitive procurement in the current protest, defendant quotes selective parts of 41 C.F.R. § 51-2.5 and states that "Section 51-2.5 provides that the Commission may 'add a commodity or service in whole or in part to the Procurement List[.]'" (alteration in original). The regulation at 41 C.F.R. § 51-2.5 provides in full:

> The Committee considers the particular facts and circumstances in each case in determining if a commodity or service is suitable for addition to the Procurement List. When the Committee determines that a proposed addition is likely to have a severe adverse impact on a current contractor, it takes this fact into consideration in deciding not to add the commodity or service to the Procurement List, or to add only a portion of the Government requirement of the item. If the Committee decides to add a commodity or service in whole or in part to the Procurement List, that decision is announced in the Federal Register with a notice that includes information on the effective date of the addition.

41 C.F.R. § 51-2.5. Although the process in 41 C.F.R. § 51-2.5 is available in the appropriate circumstance, the problem with defendant's reasoning and reliance on 41 C.F.R. § 51-2.5 is that this section of the Code of Federal Regulations addresses additions to the Procurement List. In the present protest, according to both parties to the

litigation, the items to be produced already were on the Procurement List. Moreover, as discussed above, the regulation at 41 C.F.R. § 51-6.7 indicates that when an item is already on the Procurement List and

> the nonprofit agency determines that it cannot ship the commodity in quantities specified by the required shipping date, it shall notify the central nonprofit agency and the contracting activity. The central nonprofit agency shall request a revision of the shipping schedule which the contracting activity should grant, if feasible, or the central nonprofit agency shall issue a purchase exception authorizing procurement from commercial sources as provided in § 51-5.4 of this chapter.

41 C.F.R. § 51-6.7(b). Defendant's use of 41 C.F.R. § 51-2.5 to argue that AbilityOne may opt to place scope limitations on items already on the Procurement List confuses adding items to the Procurement List with removing items already on the Procurement List.

> In addition, the JWOD Act implementing regulation at 41 C.F.R. § 51-6.8 provides:

(a) When a central nonprofit agency decides to request that the Committee delete a commodity or service from the Procurement List, it shall notify the Committee staff immediately. Before reaching a decision to request a deletion of an item from the Procurement List, the central nonprofit agency shall determine that none of its nonprofit agencies is capable and desirous of furnishing the commodity or service involved.

(b) Except in cases where the Government is no longer procuring the item in question, the Committee shall, prior to deleting an item from the Procurement List, determine that none of the nonprofit agencies of the other central nonprofit agency is desirous and capable of furnishing the commodity or service involved.

(c) Nonprofit agencies will normally be required to complete production of any orders for commodities on hand regardless of the decision to delete the item. Nonprofit agencies shall obtain concurrence of the contracting activity and the Committee prior to returning a purchase order to the contracting activity.

(d) For services, a nonprofit agency shall notify the contracting activity of its intent to discontinue performance of the service 90 days in advance of the termination date to enable the contracting activity to assure continuity of the service after the nonprofit agency's discontinuance.

(e) The Committee may delete an item from the Procurement List without a request from a central nonprofit agency if the Committee determines that none of the nonprofit agencies participating in the AbilityOne Program are capable and desirous of furnishing the commodity or service to the Government, or if the Committee decides that the commodity or service is no longer suitable for procurement from nonprofit agencies employing people who are blind or have other severe disabilities. In considering such an action, the Committee will consult with the appropriate central nonprofit

agency, the nonprofit agency or agencies involved, and the contracting activity.

41 C.F.R. § 51-6.8. There is no indication in the Administrative Record before the court that AbilityOne or the appropriate central nonprofit agency followed any of the procedures in 41 C.F.R. § 51-6.8."[20]

In addition, the regulation at 48 C.F.R. § 8.706(b) states: "Ordering offices may acquire supplies or services on the Procurement List from commercial sources only if the acquisition is specifically authorized in a purchase exception granted by the designated central nonprofit agency." Relevant to the above captioned protest, the Administrative Record before the court does not reflect that AbilityOne or SourceAmerica, the relevant central nonprofit agency, followed the steps required to issue a purchase exception and limit the scope of the procurement to a portion of the government's needs. Nor is there an indication in the Administrative Record that Goodwill Industries of South Florida, alone or in combination with other qualified nonprofits, could not meet the DLA's production deadline requirements, and, therefore, deliver the quantity identified "within the time required." See 48 C.F.R. § 8.706(b). There is also no indication in the Administrative Record that Goodwill Industries of South Florida notified SourceAmerica or DLA, the contracting activity, that "it cannot ship the commodity [the Women's IHWCU Trousers] in the quantities specified by the required shipping date," (alteration added), or that the competitive solicitation for an item on the procurement list would not "have a severe adverse impact on a current contractor," 41 C.F.R. § 51-2.3(4)(i), for the item on the Procurement List. In fact, in the current protest, Goodwill Industries of South Florida indicated that the opposite is true in its filings with the court and in the submitted declaration signed by Mr. Mark Marchioli, which states that "Goodwill is ready, willing, and able" to provide the Women's IHWCU Trousers to the DLA.

---

[20] Additionally, the court notes, as indicated above, before adding or deleting an item from the Procurement List, the JWOD Act implementing regulations state:

> At least 30 days prior to the Committee's consideration of the addition or deletion of a commodity or service to or from the Procurement List, the Committee publishes a notice in the Federal Register announcing the proposed addition or deletion and providing interested persons an opportunity to submit written data or comments on the proposal.

41 C.F.R. § 51-2.3. There is no indication in the Administrative Record before the court that AbilityOne published a notice regarding the removal of the Women's IHWCU Trousers.

Defendant also cites to 41 C.F.R. § 51-5.3(a) of the JWOD Act implementing regulations, which states:

> When a commodity is included on the Procurement List, the mandatory source requirement covers the National Stock Number or item designation listed and commodities that are essentially the same as the listed item. In some instances, only a portion of the Government requirement for a National Stock Number or item designation is specified by the Procurement List. Where geographic areas, quantities, percentages or specific supply locations for a commodity are listed, the mandatory provisions of the JWOD Act apply only to the portion or portions of the commodity indicated by the Procurement List.

According to defendant, the implementing regulation at 41 C.F.R. § 51-5.3(a) provides the flexibility needed to procure only a portion of Procurement List items from qualified nonprofits and the remainder from other suppliers. In the case of the Women's IHWCU Trousers on the Procurement List, the words, "in some instances," in 41 C.F.R. § 51-5.3(a), did not give AbilityOne, the appropriate central nonprofit agency, or procuring agencies, the discretion to unilaterally change the scope of the Procurement List items at issue in this protest without first making the findings required by the JWOD Act and its implementing regulations that qualified nonprofits could not meet the solicitation requirements in the time required by the procuring agency. Because the JWOD Act requires federal entities to obtain Procurement List items from JWOD qualified nonprofits "if the product or service is available within the period required by the entity," 41 U.S.C. § 8504(a), the statutorily expressed limitation is only for when qualified nonprofit or nonprofits cannot furnish the products or services in the timeframe required by the agency. See id.; see also 41 C.F.R. § 51-5.3(a); 48 C.F.R. § 8.706(b). It would be inconsistent, therefore, to read the JWOD Act to allow AbilityOne to limit the procurement of Women's IHWCU Trousers to only 50% of Army-Natick's needs without first making a finding that the Women's IHWCU Trousers would not be "available within the period required by the entity" from a JWOD Act qualified nonprofit. If, as in the protest currently before the court, the item is on the Procurement List, AbilityOne or the appropriate central nonprofit agency, SourceAmerica, would first have had to determine that the JWOD Act qualified nonprofits could not meet the time requirements of the solicitation before seeking to procure the commodity competitively, and the Administrative Record before the court does not indicate that AbilityOne or SourceAmerica determined that Goodwill Industries of South Florida, alone or in combination with other JWOD Act qualified nonprofits, did not have the capacity to produce the required Women's IHWCU Trousers within the DLA's required deadline. It is inconsistent with the language of the JWOD Act and its implementing regulatory framework for the DLA, a federal entity to which the JWOD Act and its implementing regulations apply, to procure the Women's IHWCU Trousers competitively. Therefore, the DLA's attempt to procure the Women's IHWCU Trousers from a commercial supplier in a competitive procurement was arbitrary and capricious. See 5 U.S.C. § 706(2)(D).

Defendant also urges the court to find, based on an argument with regard to the "C-List" reference in the January 11, 2021 Notice of Addition issued by AbilityOne, that DLA Troop Support was not required to purchase the Female Improved Hot Weather Trousers through the AbilityOne Program, because only the agency specified by the Notice of Addition is required to purchase "C-List" items from JWOD qualified nonprofits. As indicated above, the January 11, 2021 Notice of Addition, which was not promulgated as a formal regulation, stated:

**PROCUREMENT LIST**

**NOTICE OF ADDITION**

TO: Army Contracting Command – Aberdeen Proving Ground, Natick Contracting Division

SourceAmerica

In accordance with 41 CFR 51-6.13(b), the U.S. AbilityOne Commission (Commission) has determined that the following products are additional sizes, colors, or other variations of products already on the Procurement List (PL) and that these products have not recently been procured. Accordingly, the products are automatically considered to be on the PL [Procurement List] at the Fair Market Prices (FMP) indicated

**Product Name:**     Trouser, Improved Hot Weather Combat Uniform (IHWCU), Permethrin, Women's, Army

| Product NSN | Size |
|---|---|
| 8415-01-687-6651 | 25-X Short |
| 8415-01-687-6669 | 25-Short |
| 8415-01-687-3100 | 25-Regular |
| 8415-01-687-6659 | 28-A Short |
| 8415-01-687-6201 | 28-Short |
| 8415-01-687-6555 | 28-Regular |
| 8415-01-687-6180 | 28-Long |
| 8415-01-687-1971 | 31-X Short |
| 8415-01-687-1339 | 31-Short |
| 8415-01-687-1353 | 31-Regular |
| 8415-01-687-6673 | 31-Long |
| 8415-01-687-2126 | 31-X Long |
| 8415-01-687-6147 | 35-Short |
| 8415-01-687-2060 | 35-Regular |
| 8415-01-687-1345 | 35-Long |

8415-01-687-4018          35-X Long

The following information is applicable to all products listed above

**Product Description:** The Improved Hot Weather Combat Uniform (IHWCU) trouser has one (1) button/buttonhole closure with seven (7) belt loops along with a covered fly with three (3) buttons and buttonhole closure, two (2) side hanging pockets, two (2) front side pleated cargo pockets with three (3) buttons/two (2) buttonholes closure flaps. The trousers include a double needle seat patch and knee reinforcement patches and a mesh fabric attached on the inside of the trousers at the bottom of the legs as inner cuffs. Both the bottom of the trousers legs and the inner cuffs have drawstrings. The trouser is treated with permethrin, wind resistant, and wrinkle free. UOI is PR.

**Unit of issue:** PR
**FMP Category:** Post Treated Garment - Rapid Fielding
**FMP Change Mechanism:** Negotiated
**FOB Origin FMP:** $62.34
**FOB Destination FMP:** $62.50

In accordance with 41 CFR 51-2.7, change to the FMP outside of the approved methodology above and provisions in the U.S. AbilityOne Pricing Policy 51.610, *Pricing AbilityOne Products*, must be approved by the Commission before a contract is awarded or an existing contract is modified.

**Distribution:** C-List

**Contracting Activity:** Army Contracting Command - Aberdeen Proving Ground, Natick Contracting Division

**Mandatory for:** 50% of the requirement of the Department of Defense

**Designated Source of Supply:** Goodwill Industries of South Florida, Inc., Miami, FL, a nonprofit agency associated with SourceAmerica, is authorized to accept orders for the products listed above.

This addition to the Procurement List is effective the date of this notice. In accordance with 41 CFR 51-5.3, this change does not affect contracts for the product awarded prior to the effective date of the Procurement List addition or options exercised under those contracts. Please direct questions regarding this Notice to Operations@abilityone.gov.

(capitalization and emphasis in original).

Although agreeing with protestor in general, that the Women's IHWCU Trousers were on the Procurement List, defendant argues that the "Commission recognized that the AbilityOne program is sufficiently broad to include specialized or niche products made pursuant to custom agency specifications (C List items)," citing the 2006 notice in the Federal Register, 2006 Clarification, 71 Fed. Reg. at 69,536 (Dec. 1. 2006). Defendant states,

> [i]f the Commission finds that the contracting activity's requirement is suitable for procurement as a C List item through the AbilityOne program, procurement of that requirement is only mandatory for that sponsoring contracting activity and subject to any scope limitations placed by the Commission necessary to tailor the requirement to the needs of the contracting activity and the capability of the nonprofit agency supplier."

Therefore, defendant asserts "DLA Troop Support's requirements [for its required quantity of Women's IHWCU Trousers] are not on the Procurement List." (alteration added). Defendant continues,

> [i]n this case, the Commission's 2021 notice provided that the female improved hot weather trousers were "C-List" items. The sponsoring contracting activity is Army-Natick. As demonstrated above, DLA Troop Support's requirements are much broader and may require multiple contractors to satisfy DLA Troop Support's needs. Compare AR [Administrative Record] Tab 13, at 234 (Army-Natick contract with Goodwill [Industries of South Florida] for purchase for 68,991 combat pants), with AR [Administrative Record] Tab 12, at 224 (Army fielding projections to DLA Troop Support reflecting requirements for between 183,052 and 256,196 combat pants per year); see also AR Tab 16, at 296 (explaining that few contractors have the capacity to support DLA Troop Support's requirements of combat pants). There is no record evidence showing that Goodwill is capable of satisfying DLA Troop Support's requirements.

(alterations added; internal citations omitted).

Moreover, defendant argues that the 2006 Clarification

> is consistent with the Commission's duty to ensure that a particular requirement is suitable for provision through the AbilityOne program and its regulatory authority to place scope limitations on additions to the Procurement List. The "mandatory provisions of the JWOD Act," therefore, only apply to the portion of the sponsoring contracting activity's requirement that was added to the Procurement List.

In this protest, the contracting officer's November 17, 2021 Memorandum for Record indicated, in part:

DLA Troop Support considered the fact that the Procurement Notice of Addition that added the IHWCU-F to the PL [Procurement List] identifies the item as being a C list item, which from the 2006 *Clarification* means that it is a specialized item designed to meet the needs of a single Agency or group of customers. Further the 2006 *Clarification* indicated that the products on the C list are only mandatory for the agency which sponsored them. In this case, Natick has been designated as the Agency that sponsored the addition of the IHWCU-F Coat and Trouser to the PL.

(emphasis in original; alteration added).

Ms. Zeich, the Deputy Executive Director and Chief Operating Officer of AbilityOne, agreed with the defendant's position, which she offered at hearings with all parties and the court present, and in her declaration filed with the court. In Ms. Zeich's declaration, she stated:

As set forth in the 2006 clarification, only the sponsoring contracting activity may procure C-List items through the AbilityOne program. The sole sponsoring contracting activity for the female IHWCU Trousers is Army-Natick. Thus, to the extent that DLA Troop Support seeks to procure those products through the AbilityOne program, I understand that DLA Troop Support has two options. First, it may refer its request to the sponsoring contracting activity, Army-Natick. Second, it may request that the Commission amend the Procurement List to add it as an additional sponsoring contracting activity. Outside of these avenues, I understand that DLA Troop Support must procure these products using competitive procedures because it currently lacks authority to purchase these products through the AbilityOne program.

(alteration added).

Protestor responds to the defendant's arguments and Ms. Zeich's statements in her declaration regarding the 2006 Clarification by arguing:

Defendant seems to be suggesting here that it might have been justified in ignoring the JWOD Act set-aside for IHWCU-F trousers, on the grounds that DLA may be buying more trousers than the Army has. That suggestion is clearly counterfactual. First, Goodwill [Industries of South Florida] actually submitted a proposal in DLA's procurement; Goodwill [Industries of South Florida] wouldn't have done that unless it could meet the requirement. Second, Goodwill has represented to the Court that it is ready, willing and able to meet the requirements set forth in the DLA Solicitations. Third, the record is clear that DLA *never even considered* Goodwill [Industries of South Florida] as a potential source; its "market survey" of suppliers never even mentions Goodwill [Industries of South Florida], *the only existing*

*manufacturer.* Therefore, neither DLA nor AbilityOne has any rational basis on which to conclude that Goodwill could not meet this need.

Moreover, it simply isn't correct to say that DLA's requirements are "much broader" than the current requirements that Goodwill has been fulfilling (with DLA money, under an Army prime contract). Goodwill [Industries of South Florida] now is making and delivering approximately 8400 IHWCU-F trousers each month, *i.e.,* ~100,000 per year. The actual stated requirement for this coming year is 166,158. AR 508. If DLA actually needed more than the 100,000 that Goodwill [Industries of South Florida] is now producing, however, then presumably, it already would have ordered more, through the Army prime contract with Goodwill [Industries of South Florida].

As the Defendant itself notes, this requirement traditionally has been divided between Goodwill and ReadyOne, another workshop, going back to 2010. Although the Defendant has not spelled out the extent of ReadyOne's production in the record, it appears that even the highest figures cited for DLA's purchases don't exceed what Goodwill [Industries of South Florida] and ReadyOne already can produce for the Army—and, also, there is no reason to think that Goodwill [Industries of South Florida] could not expand annual production from 100,000 to 166,158 to cover all of it.

If one were to assume, *arguendo*, that workshops could not meet DLA's full requirement for this item, then the proper means for the Defendant to proceed under the JWOD Act would have been for AbilityOne to make a *rational determination* as to *how much* of the item would be "**available within the period required by the entity**," *i.e.*, DLA, from workshops like Goodwill [Industries of South Florida]. 41 U.S.C. § 8504(a). The record reflects nothing of the kind. The Defendant's *speculation* that Goodwill [Industries of South Florida] *might* not be able to meet DLA's requirements certainly is no conceivable justification for cutting off Goodwill [Industries of South Florida] production entirely.

(emphases in original; alterations added).

Furthermore, protestor correctly argues that

[t]he 2006 statement is not a regulation, or any other form of binding law. See 5 U.S.C. § 553. The February 2006 notice that preceded it was not identified as a notice of proposed rulemaking. It does not cite to, nor does it rely upon, AbilityOne's rulemaking authority. It is not codified in the Code of Federal Regulations. It is, at best, a statement of the agency's practice, and therefore legally subservient to the JWOD Act, AbilityOne's actual regulations, and the FAR.

The 2006 Clarification, issued by AbilityOne as a notice and not promulgated as a regulation, states:

The third category (the C List) contains specialized or niche products (i.e., adapted to a specific function or demand) that are most often designed and manufactured to meet the needs of a single Federal agency, or a group of customers with a unique requirement. These products, when furnished under the JWOD Program, are sponsored by and have procurement preference for the specific Federal agency or agencies that defined the requirement. The JWOD procurement preference does not apply to Federal Agencies that are not identified on the Procurement List documentation for such items. Generally, C List items are only made available to Federal customers through the distribution channels authorized by the requiring office. If Federal agencies whose requirements are not specified on the Procurement List would like to purchase C list items, they must refer their request to the sponsoring contracting activity. Alternatively, Federal agencies may ask the Committee to change the Procurement List in order to add their agency as an additional contracting Activity.

See 2006 Clarification, 71 Fed. Reg. 69,535, 69,536.

Although in the January 11, 2021 Notice of Addition, "Army Contracting Command – Aberdeen Proving Ground, Natick Contracting Division" was listed as the "Contracting Activity," neither the "mandatory for" line, nor the January 11, 2021 Notice of Addition, however, address the steps that AbilityOne needed to undertake to limit the scope of a procurement which involved an item on the Procurement List and subject to the JWOD Act. As discussed above, AbilityOne should have followed, but failed to follow, the required steps to establish that a JWOD Act qualified nonprofit would not be able to produce the quantity needed in the time required by the DLA in order to support and issue a competitive procurement. Under the terms of the JWOD Act and its implementing regulations, qualified nonprofits are the mandatory sources of supply for all federal entities for Procurement List items, and Goodwill Industries of South Florida already was a supplier of the Women's IHWCU Trousers. The words of the 2006 Clarification issued by AbilityOne and defendant's "C-List" arguments do not change the requirements of the JWOD statute or the implementing regulations, nor does the 2006 Clarification change Goodwill Industries of South Florida's status as a qualified nonprofit provider for the Women's IHWCU Trousers under the JWOD Act. Protestor and defendant agree that the Women's IHWCU Trousers were added to the Procurement List. Therefore, defendant's reliance on the 2006 Clarification to avoid a mandatory source of supply created by the JWOD Act and its implementing regulations is misplaced. The 2006 Clarification, which enumerated, the "A-List," "B-List," and "C-List" structure and which purported to identify and add a scope limitation to the JWOD procurement preference was not promulgated as a regulation through notice and comment, see 2006 Clarification, 71 Fed. Reg. 69,535, 69,536 (Dec. 1, 2006), which, protestor correctly points out, is "legally subservient" to the JWOD Act and its identified implementing, properly promulgated regulations. There is no reference to "A-List," "B-List," or "C-List" items in the JWOD Act or in its implementing regulations. In fact, the 2006 Clarification is inconsistent with the language of the JWOD Act and its implementing regulations, which establish JWOD qualified nonprofits as the

mandatory source of supply for Procurement List items absent specific findings, and which are controlling over a simple notice, albeit published in the Federal Register. See 41 U.S.C. § 8504(a); 41 C.F.R. § 51-1.2 (Mandatory source priorities); 41 C.F.R.§ 51-2.4 (Determination of suitability); 41 C.F.R. § 51-2.8 (Procurement list); 41 C.F.R. § 51-5.2 (Mandatory source requirement); 41 C.F.R. § 51-5.3 (Scope of requirement); 41 C.F.R. § 51-5.4 (Purchase exceptions); 41 C.F.R. § 51-6.7 (Orders in excess of nonprofit agency capability).

Furthermore, defendant's discussion and reliance on a particular cabinet agency subdivision of an agency sponsorship of a particular product does not address whether or not the agency must, nonetheless, conform to the JWOD Act and implementing regulatory program when continuing to procure a product on the Procurement List under the JWOD Act and its implementing regulations. The Administrative Record before the court does not establish that the requisite findings under the JWOD Act and its properly promulgated implementing regulations were made in the protest currently before the court, either by AbilityOne or by SourceAmerica, the relevant central nonprofit, that JWOD Act qualified nonprofits could not meet the commodity production requests in the DLA's solicitation. See 41 C.F.R. § 51-6.7; 48 C.F.R. § 8.706(b). To the contrary, as indicated above, the declaration filed with the court by protestor by Mark Marchioli, Vice President of Business Development of Goodwill Industries of South Florida, states that Goodwill Industries of South Florida is willing to meet the DLA's needs and has the capability to meet the DLA's requirement. The declaration by Mr. Marchioli indicates that "Goodwill [Industries of South Florida] is ready, willing, and able to provide these items as a stand-alone item delivered to the Government directly, or as an item to a contractor selling larger groups of other items to the Government, in accordance with the supply requirements in the solicitations for the IHWCU-F trousers." Once a qualified nonprofit so indicates, if the agency wishes to issue a competitive procurement instead of awarding a contract to a JWOD qualified nonprofit, the burden is on the central nonprofit agency or AbilityOne to determine that a JWOD qualified nonprofit does not have the capacity to produce the requirement "within the period required by the entity." See 41 U.S.C. § 8504(a); see also 41 C.F.R. § 51-5.4(a)–(b). The 2006 Clarification does not excuse the DLA from first having to obtain the Women's IHWCU Trousers from qualified nonprofits unless such JWOD Act qualified nonprofits cannot produce the quantity of Women's IHWCU Trousers for DLA Troop Sustainment in the required time. Because the DLA failed to follow the existing statutory requirements of the JWOD Act and the properly promulgated, applicable implementing regulations during the procurement of the Women's IHWCU Trousers before issuing a competitive, commercial procurement, defendant acted arbitrarily and capriciously.

Prejudice

As discussed above, "[a] bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract," and "[s]econd . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that

conduct." Bannum, Inc. v. United States, 404 F.3d at 1351; T Square Logistics Servs. Corp. v. United States, 134 Fed. Cl. at 555; Archura LLC v. United States, 112 Fed. Cl. at 496. In describing the prejudice requirement, the Federal Circuit also held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574–75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration.'" (citation omitted)).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (alteration in original); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d at 1326; Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319.

The court has determined that the defendant acted arbitrarily and capriciously when it violated the JWOD Act and its implementing regulations by issuing a competitive solicitation for the Women's IHWCU Trousers without a determination by AbilityOne or SourceAmerica that a qualified nonprofit was unable to meet the DLA requirement. This is especially true given protestor's assertion that it could produce the required quantity of the Women's IHWCU Trousers in a timely fashion in accordance with the deadline requirements of the agency. See 41 C.F.R. § 51-5.4(a)–(b). Therefore, the court must consider whether there was a substantial chance for Goodwill Industries of South Florida to have received the contract, or requirement, absent the government's error.

As explained above, the JWOD Act and its implementing regulations establish that nonprofit agencies which employ people who are blind or who are otherwise severely disabled are the mandatory sources of supply of items on the Procurement List for all federal entities seeking to purchase such items, with limited exceptions that do not apply to this protest. See 41 U.S.C. § 8504(a); see also 41 C.F.R. §§ 51-1.2, 51-5.2.8, 51-5.2, 51-5.4, 51-6.7; 48 C.F.R. §§ 8.701, 8.703, 8.704, 8.705-1(b), 8.706. As determined above, the DLA is a component of the Department of Defense, and is an entity of the federal government, see 41 U.S.C. § 8504(a), and the DLA is specifically named as an entity covered by the JWOD Act and its implementing regulations. See 48 C.F.R. § 8.703. Therefore, the DLA was required to purchase Procurement List items, including the Women's IHWCU Trousers from JWOD Act qualified nonprofit organizations in situations in which a qualified nonprofit indicated it could meet the agency's requirements in a timely fashion. Moreover, Army-Natick had been procuring 50% of its supply of the unisex

IHWCU Trousers, the predecessor to the Women's IHWCU Trousers, and the Women's IHWCU Trousers from Goodwill Industries of South Florida, and as a qualified nonprofit, was apparently "ready, willing, and able" to produce the identified request. Because the Administrative Record demonstrates Goodwill Industries of South Florida's readiness to timely produce the required product and the Administrative Record does not contain information that Goodwill Industries of South Florida could not do so, alone or together with another qualified nonprofit, or that AbilityOne or SourceAmerica went through the required steps to issue a purchase scope exception to the Procurement List, the court finds that, but for the DLA's attempt to procure the Women's IHWCU Trousers competitively, Goodwill Industries of South Florida had, or should have had, a "'substantial chance that [it] would receive an award – that it was within the zone of active consideration.'" Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367 (quoting CACI, Inc.-Fed. v. United States, 719 F.2d at 1574–75).

Permanent Injunction

In its prayer for relief, protestor's complaint requests a permanent injunction prohibiting the "federal acquisition of the Goodwill items, and any replacement item or variation of the Goodwill items, and any item that is 'essentially the same' or 'similar,' from any source other than Goodwill [Industries of South Florida]." In Centech Group, Inc. v. United States, the United States Court of Appeals for the Federal Circuit set out the test for a permanent injunction, stating:

> To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief.

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing PGBA, LLC v. United States, 389 F.3d 1228–29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987))); see also Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir.) (finding that a plaintiff who cannot demonstrate actual success on the merits cannot prevail on its motion for permanent injunctive relief, reh'g and reh'g en banc denied (Fed. Cir. 2004); MVM, Inc. v. United States, 149 Fed. Cl. 478, 492 (2020); Kiewit Infrastructure West Co. v. United States, 147 Fed. Cl. 700, 712 (2020); Remington Arms Co., LLC v. United States, 126 Fed. Cl. 218, 232 (2016). Judges of this court have indicated that success on the merits is "the most important factor for a court to consider when deciding whether to issue injunctive relief." Dellew Corp. v. United States, 108 Fed. Cl. 357, 369 (2012) (citing Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1312). While success on the merits is necessary, it is not sufficient for protestor to establish that it is entitled to injunctive relief. See Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 353 ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well.") (citing

PGBA, LLC v. United States, 389 F.3d at 1228-29). The four factors are to be considered collectively, rather than individually. See Sheridan Corp. v. United States, 94 Fed. Cl. 663, 668 (2010). In Sheridan Corp. v. United States, a Judge of this court stated:

> No one factor, taken individually, is necessarily dispositive. . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp. [v. United States], 3 F.3d [424,] 427 [(Fed. Cir. 1993)]. Conversely, "the absence of an adequate showing with regard to any one factor may be sufficient" to deny injunctive relief." Id.

Id. (first and second alterations in original; remaining alterations added); see also Comput. World Servs. Corp. v. United States, 147 Fed. Cl. 584, 595 (2020); Wallace Asset Mgmt., LLC v. United States, 125 Fed. Cl. 718, 727 (2016); Amidon, Inc. v. United States, 124 Fed. Cl. 517, 522 (2015).

"In evaluating irreparable harm, '[t]he relevant inquiry . . . is whether plaintiff has an adequate remedy in the absence of an injunction.'" Wavelink, Inc. v. United States, 154 Fed. Cl. 245, 288 (2021); see also Melwood Horticultural Training Ctr., Inc. v. United States, 153 Fed. Cl. at 743 (stating that permanent injunctive relief is warranted when, among other factors, "the movant will suffer irreparable harm absent an injunction."). "This Court consistently has held that the lost opportunity to compete for a contract constitutes irreparable harm." Sierra Nevada Corp. v. United States, 154 Fed. Cl. 424, 440–41 (2021); see also Sys. Studies & Simulation, Inc. v. United States, 146 Fed. Cl. at 203 (finding irreparable harm when the disappointed bidder "stands to lose not simply the monetary value of the contract (a substantial sum), but also the training opportunities that would naturally stem from performance of the contract"); Femme Comp Inc. v. United States, 83 Fed. Cl. 704, 772 (2008) ("[A]ny offeror that should have been awarded a contract, but was not, will be at a disadvantage when competing for future contracts. No adequate remedy exists to make up for this potential loss of business or competitive advantage.").

Finally, with regard to the public interest factor, "the public interest is served by injunctive relief where the court has concluded that the government violated an applicable regulation and related provisions in the solicitation, and 'maintenance of the integrity of the procurement process weighs heavily in favor of granting a permanent injunction.'" Q Integrated Cos. LLC v. United States, 126 Fed. Cl. 124, 147 (quoting Springfield Parcel C, LLC v. United States, 124 Fed. Cl. 163, 193 (2015)), appeal dismissed, 691 F. App'x 906 (Fed. Cir. 2016); see also Sierra Nevada Corp. v. United States, 154 Fed. Cl. at 441 (citing MVM, Inc. v. United States, 46 Fed. Cl. 137, 143 (2000) ("Many cases have recognized that the public interest is served when there is integrity in the public procurement system.")); United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. at 323 ("[T]he public has a strong interest in preserving the integrity of the procurement process.") (citing Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994)); Am. Safety Council, Inc. v. United States, 122 Fed. Cl. 426, 444 (2015) (holding that "the public interest will be served by an injunction by preserving the integrity of the procurement process"); Applied Bus. Mgmt. Sol., Inc., LLC v. United States, 117 Fed. Cl.

589, 608 (2014); BINL, Inc. v. United States, 106 Fed. Cl. 26, 49 (2012) ("With regard to the public interest, it is well-settled that there is a public interest in remedying violations of law."); Bilfinger Verger AG Sede Secondaria Italiana v. United States, 94 Fed. Cl. 389, 393 (2010) ("The public interest in preserving the integrity and fairness of the procurement process is served by enjoining arbitrary or capricious agency action."); Sys. Studies & Simulation, Inc. v. United States, 146 Fed. Cl. at 204 ("Public interest is best served by requiring the government to comply with federal procurement law.").

In the above captioned bid protest, Goodwill Industries of South Florida established success on the merits by demonstrating that the government acted arbitrarily and capriciously when attempting to procure the Women's IHWCU Trousers using the competitive solicitation approach without following the required procedures under the JWOD Act and its implementing regulations for determining that qualified nonprofits were unable to meet the DLA's requirements. See Dellew Corp. v. United States, 108 Fed. Cl. at 369. Having concluded that the protestor succeeded on the merits of its bid protest, the court must consider the three additional factors to determine whether protestor is entitled to a permanent injunction.

As described above, protestor must demonstrate that "it will suffer irreparable harm if the court withholds injunctive relief." See Centech Grp., Inc. v. United States, 554 F.3d at 1037. To prove such irreparable harm, protestor points the court to the declaration of Mark Marchioli, the Vice President of Business Development of Goodwill Industries of South Florida. Mr. Marchioli declares under penalty of perjury:

> If the IHWCU-F trouser [Women's IHWCU Trousers] requirement is awarded to any entity other than Goodwill [Industries of South Florida], it will eliminate 114 direct labor positions, including approximately 85 people with disabilities in March 2022. For IHWCU-F trousers, we would have to lay off 114 people, with an annualized payroll of approximately $2.1M.

(alterations added). Mr. Marchioli also asserts in his Declaration:

> Goodwill [Industries of South Florida] has spent what, for Goodwill [Industries of South Florida], are enormous sums of money to establish this production line. For equipment and production setup, the required investment is $99,255. To discontinue the program, we will have idle equipment valued at approximately $450,000, and underutilized space valuing $150,000 annually. There is no practical means to recover these losses.
>
> The effect on these workers, on Goodwill [Industries of South Florida] would be devastating. These losses would threaten the existence of Goodwill [Industries of South Florida].
>
> Layoffs to our disabled workforce would make it difficult, if not impossible, to find new work in the current conditions. There are over 400,000 unemployed people with disabilities in the Miami-Dade and Broward

66

counties, which exceeds the unemployment rate for non-disabled people.

> Goodwill [Industries of South Florida] is ready, willing, and able to provide these items as a stand-alone item delivered to the Government directly, or as an item to a contractor selling larger groups of other items to the Government, in accordance with the supply requirements in the solicitations for the IHWCU-F trousers.

(alterations added). Protestor, citing Transatlantic Lines LLC v. United States, 68 Fed. Cl. 48, 56–57 (2005), alleges that "[t]o assess irreparable injury to the plaintiff, the inquiry focuses on whether the company has an adequate remedy in the absence of an injunction." Protestor, citing to Red River Service Corp. v. United States, 60 Fed. Cl. 532 (2004) and Varicon International v. Office of Personnel Management, 934 F. Supp. 440 (D.D.C. 1996), alleges that

> [i]f an injunction is not granted, Goodwill [Industries of South Florida] will lose substantial revenue and profit for which it has no adequate remedy at law, since lost profits are not recoverable for improperly awarded contracts. Additionally, without injunctive relief, AGMA [sic] will have lost the protection conferred on it by the JWOD Act and related regulations.

(alterations added).

Defendant has not directly challenged or addressed protestor's arguments that Goodwill Industries of South Florida would be irreparably harmed should the procurement of the Women's IHWCU Trousers be competitively solicited and if DLA were to award the two contracts competitively, "one set aside for HUBZone small business concerns and one set aside for Small Business concerns," rather than make award to JWOD Act qualified nonprofit organizations. The court finds that, given the declaration of Mr. Marchioli, the operations of Goodwill Industries of South Florida, and its employees would be irreparably harmed by the DLA competitive procurement at issue in this protest. Also, the protestor would be irreparably harmed by the government's decision to unilaterally carve out exceptions to the JWOD Act and its implementing regulations without following proper procedures and by awarding the contracts through a competitive process.

Third, protestor must demonstrate that "the balance of hardships to the respective parties favors the grant of injunctive relief." Centech Grp., Inc. v. United States, 554 F.3d at 1037. As noted in System Studies & Simulation, Inc. v. United States, 146 Fed. Cl. 186, "[a]lthough injunctions inevitably cause the government some delay, 'only in an exceptional case would [delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests.'" Id. at 203 (quoting Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 715 (2006)) (alteration in original). Protestor alleges that the "balancing of hardships clearly favors Goodwill [Industries of South Florida]. According to protestor, without relief, Goodwill [Industries of South Florida] will have to shut down these production lines and Goodwill's investment in them. Goodwill [Industries of South Florida]'s workers will lose their jobs with little hope of finding others, and Goodwill [Industries of South Florida's] continued existence will be threatened."

(alterations added). Moreover, the court notes that it is important to maintain the integrity of a congressionally enacted, statutory and a properly, promulgated, regulatory program, including the procedures which the JWOD Act program establishes to the benefit of people who are blind or otherwise severely disabled. With regard to the DLA's obligations under the JWOD Act, protestor asserts that "[a]dvancing the salutary purposes of the JWOD Act is hardly a 'hardship'; it's a virtue." On the other side of the balance of hardship is the possible, but limited burden, given the procedures regarding the JWOD Act and regulatory requirements on the government to have to go through the JWOD Act required procedures to establish whether there is a nonprofit entity that can meet all or a portion of the DLA requirement for the production of Women's IHWCU Trousers before soliciting for the contracts competitively. There is nothing in the Administrative Record before the court that indicates that adhering to the requirements of the JWOD Act and implementing regulations would have been unduly burdensome on the DLA to do it properly the first time. There is also no indication in the Administrative Record before the court that Goodwill Industries of South Florida, which indicated it is currently producing thousands of pairs of Women's IHWCU Trousers per month, or another qualified nonprofit entity, could not meet the demand identified by the DLA. The required administrative procedures imposed by the JWOD Act are not unduly burdensome, especially as compared to the impact and the consequences to Goodwill Industries of South Florida and its employees, who are disabled, making it difficult for them to find alternative employment. In sum, the balance of the hardships weighs in protestor's favor in this protest.

Finally, the court must consider whether "the public interest is served by a grant of injunctive relief." Centech Grp., Inc. v. United States, 554 F.3d at 1037. "[T]he public interest is served by injunctive relief where the court has concluded that the government violated an applicable regulation and related provisions in the solicitation, and 'maintenance of the integrity of the procurement process weighs heavily in favor of granting a permanent injunction.'" Q Integrated Cos. LLC v. United States, 126 Fed. Cl. at 147 (quoting Springfield Parcel C, LLC v. United States, 124 Fed. Cl. at 193). According to protestor, "it is well-established that the public interest is well-served by ensuring that the government procurement process is fair," and that the required, applicable statute and implementing regulations are followed. In addition, protestor, citing Asia Pacific Airlines v. United States, 68 Fed. Cl. 8, 27 (2005), asserts "the public interest will benefit strongly from continued gainful employment by Goodwill [Industries of South Florida's] workers, as the JWOD Act intends." Protestor also asserts that the public interest would benefit from a permanent injunction because, by continuing to provide employment opportunities through the JWOD Act to qualified nonprofits, the government would not be "obliged to pay out approximately $15,000 per year in SSDI [Social Security Disability Insurance] benefits to each unemployed disabled worker." The court concludes that the public interest is best served by requiring the government to comply with the JWOD Act, and its properly promulgated implementing regulations. See Sys. Studies & Simulation, Inc. v. United States, 146 Fed. Cl. at 204. The court finds that there is a public interest to enjoining the DLA from procuring Women's IHWCU Trousers on the Procurement List by soliciting from competitive sources which do not qualify under the JWOD Act and its implementing regulations, and to promote the statutory and regulatory goal to benefit

people who are blind or otherwise severely disabled, and to preserve the integrity of the established procurement system. On balance, the injunctive factors all weighed in favor of protestor and in favor of granting the permanent injunction.

## CONCLUSION

Based on the declared, immediate urgency for the court to decide the protest, the court previously issued an oral decision informing the parties of its decision, which was effective immediately. The court ruled that the actions of the government during the procurement by the DLA of the Women's IHWCU Trousers did not follow the existing requirements of the JWOD Act and its implementing regulations, and that, therefore, the DLA's actions were arbitrary, capricious, and without a rational basis. This written Opinion memorializes that oral decision. Protestor's motion for judgment on the Administrative Record, including protestor's request for a permanent injunction, was granted. Defendant's motion for judgment on the Administrative Record was denied. Solicitation No. SPE1C1-21-R-0029 to procure the Women's IHWCU Trousers using competitive procedures was enjoined at the time of the court's issuance of the oral Opinion. The Clerk of the Court shall finalize **JUDGMENT** consistent with this Opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**